[No. F030228. Fifth Dist. Feb. 29, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
DONNIE RAY O'NEAL, JR., Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and III.

COUNSEL

George L. Schraer, under appointment by the Court of Appeal, for defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Michael J. Weinberger and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ARDAIZ, P. J.—

INTRODUCTION

When a defendant in a criminal case is accused of a sexual offense, the jury will sometimes consider evidence of the defendant's commission of

another sexual offense or offenses. (Evid. Code, § 1108.) The evidence of the defendant's commission of another sexual offense or offenses is offered to show the defendant's disposition or propensity to commit a sexual offense. (*People v. Falsetta* (1999) 21 Cal.4th 903 [89 Cal.Rptr.2d 847, 986 P.2d 182].) CALJIC No. 2.50.01 instructs the jury on the jury's use of this other sexual offense evidence. In 1999 this instruction was revised to include new language expressly stating "if you find (by a preponderance of the evidence) that the defendant committed (a) prior sexual offense(s), that is not sufficient by itself to prove (beyond a reasonable doubt) that (he)(she) committed the charged crime(s)." (CALJIC No. 2.50.01 (1999 rev.).) In *People v. Vichroy* (1999) 76 Cal.App.4th 92 [90 Cal.Rptr.2d 105], the Second District held that the pre-1999 version of CALJIC No. 2.50.01 deprived a defendant of due process of law because it permitted the jury to find him "guilty of the current charges solely because he had committed prior sexual offenses." (76 Cal.App.4th at p. 101.) In the published portion of the present case we respectfully disagree with *Vichroy*. We hold that the pre-1999 version of CALJIC No. 2.50.01 did not deprive appellant of due process of law.

## STATEMENT OF THE CASE

A jury found appellant Donnie Ray O'Neal, Jr., guilty of two counts of forcible rape (Pen. Code, § 261, subd. (a)(2); counts 1 & 2), kidnapping with intent to rape (former Pen. Code, § 208, subd. (d); count 3), sexual battery (Pen. Code, § 243.4, subd. (a); count 4), and robbery (Pen. Code, § 211; count 5).[1] With respect to the count 1 rape, the jury found true special allegations that appellant kidnapped the victim and that the movement of the victim substantially increased the risk of harm to her (§ 667.61, subd. (d)(2)), and that appellant tied or bound the victim during the commission of the rape (§ 667.61, subd. (e)(6)). With respect to the count 2 rape, the jury found true a special allegation that appellant kidnapped the victim for the purpose of committing the rape (§ 667.8). After the jury returned its verdict finding appellant guilty as charged on all five counts, appellant admitted a special allegation that he had incurred a prior conviction within the meaning of California's "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12). His prior conviction (§§ 667, subd. (d), 1170.12, subd. (b)) commonly referred to as a strike, was a 1991 juvenile adjudication that he had committed a robbery (§ 211). The court sentenced appellant to 25 years to life on count 1, plus a five-year enhancement for the 1991 juvenile adjudication. Appellant also received: 16 years on count 2, plus a nine-year section 667.8 enhancement, to be served concurrently with the count 1 sentence; 22 years on count 3, stayed pursuant to section 654; eight years on count 4, to be served

---

[1]All further references to code sections are to the Penal Code unless otherwise stated.

concurrently with the count 1 sentence; and 10 years on count 5, again to be served concurrently with the count 1 sentence. Appellant's total unstayed term was thus 30 years to life.

Melanie V. was the victim of appellant's five current crimes. These occurred on February 6, 1997. At appellant's trial, the prosecution also introduced evidence of a prior uncharged sexual offense. This was a January 1995 incident in which appellant exposed himself to another woman, Melanie G., in a shopping mall parking lot.

## APPELLANT'S CONTENTIONS

On this appeal O'Neal raises five contentions of error. First, he contends that the trial court erred in permitting the introduction of evidence of the January 1995 shopping mall parking lot incident. He argues that (1) evidence of the January 1995 incident should have been excluded pursuant to Evidence Code section 352, and (2) admission of evidence of the January 1995 incident violated his right to due process of law. Second, he contends that the trial court erred in instructing the jury with the pre-1999 version of CALJIC No. 2.50.01. This instruction told the jurors that they could infer from appellant's prior act of indecent exposure that he had a disposition to commit similar sexual offenses, and that "[i]f you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit" the sex crimes of which he was currently accused. Appellant contends that this instruction improperly permitted the jury to convict him solely on the basis of a disposition to commit a sex crime. Third, appellant contends that his count 3 conviction for kidnapping with intent to commit rape, and the true findings on the section 667.61, subdivision (d)(2) (count 1) and section 667.8 (count 2), special allegations should be reversed because the court failed to instruct the jury that false imprisonment is a lesser included offense of kidnapping. Fourth, appellant contends that the court erred in enhancing his sentence by five years for the 1991 juvenile robbery adjudication. The court imposed this enhancement pursuant to section 667, subdivision (a). Respondent concedes that this was error. We agree. (See *People v. West* (1984) 154 Cal.App.3d 100 [201 Cal.Rptr. 63] [a juvenile adjudication is not a "conviction" within the meaning of § 667, subd. (a)].) As we shall explain, however, we find appellant's first three contentions to be without merit. We will affirm appellant's convictions, and will remand the case to the superior court so that appellant can be sentenced as that court deems appropriate, but without the erroneous five-year section 667, subdivision (a) enhancement.

## FACTS

At approximately 8:45 p.m. on February 6, 1997, 19-year-old Melanie V. was "working" as a prostitute on Blackstone near Cornell, across from the

U&A gas station. She wore a skirt and jacket as well as panties and a bra and had her purse with her. Appellant drove from the gas station in his "80's" blue and "white" mini-truck-size two-door Blazer. He stopped in the street near Melanie and said something about $100. Melanie approached the driver's side of the Blazer and saw appellant with his penis exposed, masturbating. Appellant said: "I have a hundred dollars." He wanted her to "hurry up and get in," stating police were in the area and that he had a house "around the corner." She "kinda felt funny," had an "eerie feeling," and told appellant she would follow him in her car which was parked on the street.

Melanie followed the Blazer on Blackstone to East Clinton to a gated driveway, which the Blazer entered. There was a two-story, old, brown house at that location with a lot of junk in the front yard. Melanie parked on the street as appellant told her not to park in the driveway because his "sister" might drive by and wonder whose car was there. Appellant drove to the backyard and parked his Blazer on the pavement. The Blazer could not then be seen from the front. Melanie walked to the backyard, which was not well lit. What light there was came from a neighbor's residence or adjacent apartments.

Appellant went to the back door of the house, appeared to look for a key and get frustrated at not finding the key. Before Melanie knew it, he was strangling her and calling her a bitch. She feared for her life. While still choking Melanie, appellant dragged her into a shed, which was in the back-yard. She kicked, screamed and tried to hit and scratch him. He handcuffed one of her hands, hit her head on a table within the shed, and handcuffed her other hand behind her back. There was a "bunch of junk" in the shed. After handcuffing Melanie, appellant pulled up her skirt and removed her panties.

Appellant next placed her in his Blazer and put the seat belt on her. The Blazer had a cloth interior and was "very messy." It had bucket seats and a dash cover, and a small dog was in the backseat. Appellant said something to the effect he was a police officer and was taking her to jail. He cursed a lot and asked did she like how he faked being on "crank." Melanie asked to see his badge, and appellant showed her a laminated identification card. He then drove on East Clinton to West and then to Marks. He was "rambling on about all kinds of nonsense." At East Clinton and Marks, appellant had to stop at a traffic light. Melanie then unfastened her seat belt and attempted to jump out, but her door would not open. Appellant grabbed her by her hair and beat her head on the console. Melanie kicked out and cracked the passenger side of the windshield. Appellant held her head down, and drove. Melanie was unable to see where they were going until he stopped in a large field near an apartment complex at Shields and Valentine. Melanie was

familiar with the area, which was quiet with little traffic. While en route to the area, appellant said his mother was a prostitute and "did it" because she had to care for him. He appeared to be angry about "that" and told Melanie the reason he was "doing it" with her was because she was "working."

After parking in the field, appellant removed Melanie's shoes and threw them out the driver's side window. He leaned her seat back, crawled on top of her, masturbated, and then inserted his penis in her vagina. He withdrew his penis, reentered her vagina, ejaculated, and again withdrew. While having intercourse, appellant fondled, licked, kissed, and bit Melanie's breasts. After having sex, appellant stated that he better not see her on Blackstone again.

Appellant got back in the driver's seat, drove "further out on Shields," went into another field, and stopped. He told Melanie to face the door, uncuffed her hands, opened the door, and told her to lie on the ground for 20 minutes. While exiting the Blazer, Melanie attempted to kick out her purse, which was on the floor, but appellant picked it up and kept it. Melanie exited and lay on her side. She saw "Car Bazaar" on the license plate frame as appellant drove off and got a partial California license plate number of 387.

Melanie ran to Shields and flagged down a vehicle occupied by Ventura Flores and her family. Melanie told Flores that she had been raped and asked to be taken to a telephone. She was crying, clothed but shoeless, and her hair was "[m]ussed up." Flores took Melanie to Shields and Grantland where Melanie called "911," at 9:17 p.m., 9:20 p.m., and last at 9:34 p.m., to report the assault.

At 9:41 p.m. on February 6, 1997, Officer Martin of the Fresno Police Department (FPD) was dispatched to Shields and Grantland regarding a sexual assault of a possible prostitute. He contacted Melanie who had disheveled hair, wrinkled clothing, bloodshot eyes from crying, smeared makeup, redness near her right eye and face, and abrasions to her wrists and legs. He conducted a cursory interview and determined three locations were involved: (1) an assault in the field at Shields and Valentine, (2) an assault at a residence on East Clinton, and (3) Blackstone and Cornell where Melanie initially contacted her assailant. Melanie pointed out the crime scene at the "quite large" field, capable of containing at least three football fields, at Shields and Valentine. Martin had FPD Officer Panabaker search the area and asked the FPD Identification Bureau to respond. Panabaker found Melanie's shoes adjacent to some tire tracks, 90 feet from the south curb of Shields. Martin also alerted dispatch that a second location to search would

be on East Clinton on the north side of the street, giving a description of the house and Melanie's vehicle, which was parked in front.

Melanie was transported to Fresno Community Hospital where Officer Martin conducted an in-depth interview while Melanie awaited a rape examination. She was given a Kotex pad and underwear to wear by the hospital staff. Photographs were taken at the hospital on February 6, 1997, which show Melanie's injuries; she had no injuries prior to being assaulted by appellant. Melanie described her assailant to Martin, including his wearing a baseball cap and having facial hair. She described his vehicle, giving its approximate model year, make as "GMC or Chevy," "Blazer or Jimmy," number of doors, having two colors and no window tint. She also gave Martin three numbers from the license plate and also "Car Bazaar" being on the license plate frame. Although she mentioned her assailant saying he was a police officer, she did not say he pretended to be on "crank."

Melanie's face was swollen and she had bite marks on both breasts as well as circular marks to her wrists. Swabs, combings, blood, saliva, hair, and nail clippings were taken from her and given to the officer along with the Kotex pad she had been provided and the clothing she wore. Melanie said she was taken directly from the rape scene to the hospital and had not showered, douched, or changed clothes. She also indicated she had consensual intercourse with a condom being used within 72 hours of 2:00 p.m. on February 6, 1997, and gave her "history," i.e., informed the nurse of what the assailant did to her. She said she was a "safety girl" and always used condoms with her "Johns." Although she had no injuries to her vagina, her injuries were consistent with her "history."

Meanwhile, at 10:20 p.m. or so on February 6, 1997, FPD Officer Tafoya was dispatched to find a location on East Clinton where Melanie's vehicle was parked. He found her vehicle at what appeared to be a vacant residence. There was a large trash pile at the front door and minimal furnishings within. A "For Sale" or "For Rent" sign was posted in front. Tafoya went to the nonilluminated backyard and saw a shed with its door open. He looked inside the shed and saw female underwear, subsequently identified by Melanie as hers, and a partially unrolled condom. Using the telephone number on the posted sign, Tafoya eventually contacted the owner of the property, Dan Marley.

Marley rented the residence on East Clinton to Janet Gonzales. Appellant appeared to reside there with Gonzales, as he was present on the two occasions Marley collected rent. Marley had seen a Blazer at the residence and asked about it; he was told it belonged to "Donnie" (appellant). Marley

described both appellant and the Blazer to Officer Tafoya, telling Tafoya the Blazer was a "Chevy S-10 Blazer, blue with a silver stripe," and that he last saw appellant and Gonzales as well as the Blazer at the East Clinton residence on February 5, 1997. Appellant then had a brownish-red goatee.

On November 29, 1996, appellant had purchased a 1985 GMC Jimmy, license No. 1MVS287 at the Car Bazaar. Appellant had visited the Car Bazaar on three occasions before making the purchase, twice with his "wife" Janet. He never indicated that he had a hearing problem and never used an interpreter in dealing with the salesman. The vehicle never had its windshield replaced by Car Bazaar.

On February 12, 1997, FPD Detective Cardenas requested the assistance of the Department of Justice Apprehension Team (DOJ-AT) in apprehending appellant. On February 13, 1997, he published a "BOL" (Be On the Lookout) bulletin to law enforcement for appellant's arrest. Also on that date, Agent Reed of DOJ-AT learned appellant's girlfriend, Janet Gonzales, was living on North Hulbert, Fresno. That residence was periodically surveilled between February 20 and 25, 1997, and on February 25th, a U-Haul vehicle was seen there along with two females and two males, one of whom resembled appellant. The U-Haul was subsequently stopped after leaving the residence with Gonzales as its driver, and appellant and Serena Berry as passengers. Agent Reed found no handcuffs in the vehicle; appellant was wearing a red baseball cap. Reed learned from Gonzales that appellant's GMC Jimmy had "broke down" in Los Angeles. On February 26, 1997, Reed found the vehicle at a gas station in Castaic, California, 150 miles or so from Fresno. The vehicle was transported to Fresno on February 27th and then to the DOJ crime lab on February 28, 1997.

On February 25, 1997, Detective Cardenas contacted appellant and processed him. Appellant complied when asked to remove his jewelry and made some remarks although he had claimed he could not speak and wrote that he needed an interpreter. He was photographed that day. On February 26, 1997, samples of appellant's blood, et cetera, were taken.

On February 28, 1997, Detective Cardenas used appellant's February 25th photograph in a six-photograph lineup which he showed to Melanie. She looked at the lineup for 20 to 30 seconds and initially selected three as looking very similar; she then selected two, on both occasions selecting appellant's photograph. She informed Cardenas: "I would have to look at him in person and I'll be able to identify him in person." Appellant's photograph did not show him with distinctive facial hair.

The tire treads on appellant's GMC Jimmy were compared with the tire tracks found in the field at Shields and Valentine adjacent to Melanie's

shoes. While the tire tracks could not be identified as having been made by appellant's GMC Jimmy, they could have been made by that vehicle as they were of the same tread design and size. In other words, appellant's GMC Jimmy could not be excluded as having made the tracks.

The GMC Jimmy was processed for latent prints on March 5, 1997, and although some usable latents were developed, none were made by Melanie. However, this did not disprove Melanie was in the vehicle.

Melanie's vaginal swab indicated the presence of sperm. The DNA developed from that sample was the same as Melanie's and would not exclude appellant. The Kotex pad worn by Melanie at the hospital had sperm and the sperm's DNA was the same as appellant's as well as 4 percent of the Caucasian male population. Thus, appellant could be the donor of the sperm samples.

The windshield on appellant's GMC Jimmy had been replaced with one manufactured in 1996 within a year of November 1997. It was not replaced subsequent to September 1997 after it was purchased from Car Bazaar.

A photograph of appellant's GMC Jimmy taken by the defense shows the interior in a messy state as well as a dash cover.

*Prior uncharged offense*

On January 6, 1995, Melanie G. was walking toward her vehicle in the Fashion fair parking lot when a red vehicle pulled alongside her. Ms. G. proceeded to unlock her vehicle's door, and heard a horn honk. She turned and saw a man "jacking off" while lying in the red vehicle, which was now parked on her vehicle's driver's side. She had her back to the red vehicle when she was unlocking the door, and the honking attracted her attention to the red vehicle. She looked and saw the man stretched out from the driver's seat to the passenger's seat with his legs open, masturbating. The man had sandy, dirty brown or blond hair. She identified appellant as that man "for sure." She entered her vehicle and was not going to do anything; she then changed her mind, wrote down the red vehicle's license plate number, and went to mall security. The red vehicle had exited "kinda fast." She subsequently spoke with FPD Officer Castro and gave Castro the license number.

Officer Castro "ran" the license number and obtained a Clovis address. He went to that address and saw a vehicle matching Ms. G.'s description. Castro contacted Sue Myers and asked to speak to the driver of the vehicle. Myers had appellant speak to Castro. Castro informed appellant of the indecent

exposure incident at Fashion Fair, and appellant initially denied any involvement but later admitted he "did it." When asked why, appellant wrote: "I sometimes have bad feelings of my mom and other women that abuse me. I just started talking with a therapist today about these issues."

*Defense*

Serena Berry, appellant's former girlfriend, testified that she rode with appellant in his GMC Jimmy on the evening of February 2, 1997, when the vehicle overheated.[2] They were on their way to Oakhurst but only got to Madera when they had to return to Fresno. They stayed at a motel that night. Berry further testified that the vehicle then had damage to the driver's side of its windshield. She did not know when or where the windshield was fixed. She was also with appellant in the GMC Jimmy on February 3 or 4, 1997, when they were stopped by the police due to the damaged windshield. She was again with appellant when he was arrested on the present charges.

Carol and Richard Lozano testified that appellant and his family, including Gonzales and Berry, moved into their residence and were staying there on February 6, 1997. Appellant was their good friend and was in their residence on February 6th, from 5:30 to 6:00 p.m. until past midnight. He never left their home that night. Although both Carol and Richard were aware of appellant's arrest on February 25, 1997, and incarceration thereafter, they never went to the police or the prosecutor regarding appellant's presence with them on February 6th. When the prosecutor's investigator asked Carol for the names and addresses of witnesses to the events of February 6, she failed/refused to give him the information.

Richard further testified that appellant's Blazer was inoperable on February 6, 1997, and had been at "Howard's" a few days prior thereto to have its freeze plug repaired. Appellant drove a U-Haul vehicle while the Blazer was being repaired. Richard also recalled damage to the driver's side of appellant's windshield, which occurred after February 6, 1997. The windshield appeared to have been cracked from the outside; appellant said it happened when he went to his "old house" and someone hit the windshield. Gonzales had the windshield repaired at a shop, which Richard believed was on Blackstone.

Howard Dunham testified that appellant's Blazer was brought to him on February 3, 1997, and appellant did not get it until February 7, 1997.

---

[2]Ms. Berry testified that she was appellant's girlfriend from January of 1996 to January or February of 1997, and that in February of 1997 appellant had another girlfriend, Janet Gonzales. Ms. Berry also testified that she still spoke with and visited appellant about twice per month thereafter, and that she had last spoken to him one week prior to the day of her trial testimony. She was asked "Is it fair to say, Miss Berry, that you love the Defendant?" She replied, "Yes, I do."

Dunham subsequently stated that Gonzales brought him the vehicle. Appellant drove Dunham's gray van, which does not look like a U-Haul truck, in the meantime. Dunham believed his memory was the same as in May 1997 when he was interviewed by Alan Meindersee, a member of appellant's defense staff. He was not then sure of the date he fixed appellant's vehicle.

Meindersee testified that Dunham stated in May that he got the Blazer three days prior to February 6th. At the second interview, Dunham stated the vehicle was brought to him on February 3d and returned to appellant on February 7th. Dunham did not appear to be uncertain of the dates. When shown his report dated May 30, 1997, Meindersee acknowledged there was no mention of Dunham getting the Blazer three days before February 6th. Moreover, his report states that Dunham was unsure of the exact date, that it was in late February 1997, and he had the Blazer five days. In the second interview on October 9, 1997, Dunham said he had the vehicle from February 5th to 7th. Again, there is nothing in the report showing Dunham said he received the vehicle a few days before February 6th.

Meindersee took the photographs of appellant's vehicle but could not recall when he did so. When he inspected the vehicle, he found that the passenger seat would not fully recline; "it would only . . . go backwards so far." On redirect examination, Meindersee contended that the "February" in his May 30th report should be "January."

Richard Barnes, a defense investigator, measured the 9.2-mile route from Blackstone and Ashlan to Shields and Valentine, making three roundtrips. He traveled the route at the speed limit without making any stops in approximately 19 minutes. When he stopped at Cornell for three minutes, at East Clinton for five minutes, at Shields and Valentine for five minutes, at Shields and Hayes for two and one-half minutes, and 30 seconds at Shields and Grantland; the calculated total time was 34 minutes. Barnes's report shows the total time was 37 minutes, which accounts for having to get up to speed and into traffic after making the various stops.

*Rebuttal*

Melanie V. testified that the Blazer's seat reclined but did not "go flat."

The prosecutor's investigator, Jalaine Hogue, was never informed that the Lozanos had information regarding appellant's whereabouts on February 6, 1997. Hogue was involved in contacting all 29 of the window repair shops on Blackstone regarding the replacement of a front windshield on a 1985 GMC Jimmy; none of the shops had done so. Eleven such shops within the near vicinity of Blackstone were also contacted with negative results.

I.*

*Evidence of the January 1995 Incident Was Properly Admitted*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II.

*The Court Did Not Err in Instructing the Jury With CALJIC No. 2.50.01*

 The court instructed the jury with CALJIC No. 2.50.01, as that instruction read before its 1999 revision. The instruction stated in pertinent part: "If you find that the Defendant committed a prior sexual offense, you may, but are not required to, infer that the Defendant had a disposition to commit the same or similar type sexual offenses. If you find that the Defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused."[6]

Appellant's argument that the instruction was erroneous is not a model of clarity, but may best be expressed in the words of appellant's own brief: "Appellant's argument has two parts. The first is that it is error to instruct the jurors they can infer a predisposition to commit the charged offenses from the prior act of indecent exposure. The second is that it is error to instruct the jury that if they found appellant had this predisposition they could infer appellant committed the charged offense."

Appellant's first argument appears to be a rehash of his argument that a defendant's right to due process of law is violated by the admission of evidence of prior sexual offenses. As we pointed out in the unpublished part

---

*See footnote *ante*, page 1065.

[6]Immediately following this instruction, the court further instructed the jury as follows: "For the limited purpose for which you may consider this evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider this evidence for any other purpose. [¶] Within the meaning of the preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that a Defendant committed a crime or sexual offense other than those for which he is on trial. [¶] You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that a Defendant committed the other crime or sexual offense. [¶] Now, that is as opposed to proof beyond a reasonable doubt as I will instruct you as to the charges alleged in the Information. Do you understand the difference? I think you're indicating to me that you do. [¶] Preponderance of the evidence means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it. [¶] You should consider all of the evidence bearing upon every issue regardless of who produced it."

I of this opinion, this contention was rejected in *People v. Falsetta, supra,* 21 Cal.4th 903. He appears to try to transform this admissibility of evidence argument into an instructional argument. He does this by arguing that the jury may not be instructed that evidence of the defendant's commission of other sexual offenses may be used by the jury to infer that the defendant has a disposition to commit the charged sexual offense or offenses. In short, appellant appears to contend that because evidence of other sexual offenses may not properly be admitted to show a defendant's disposition to commit a sexual offense, a jury may not be *told* that evidence of the defendant's other sexual offenses has been admitted for precisely this purpose. Notably, appellant does not tell us what he thinks a proper instruction on the "other sexual offense" evidence should say. That is because he contends this evidence has no legitimate purpose and is not admissible in the first place. Appellant's premise (that the evidence is inadmissible) is wrong.

The second part of appellant's argument appears to us to be just like the first part. He states "[t]he second part of appellant's argument is that the instruction violates the rule of federal constitutional law precluding a verdict based in part on the defendant's propensity or disposition." We are aware of no such rule of federal constitutional law. *People v. Falsetta* pointed out that a jury "could use the evidence of prior sex crimes to find that defendant had a propensity to commit such crimes, which in turn may show that he committed the charged offenses." (*People v. Falsetta, supra,* 21 Cal.4th at p. 923.) " '[T]he admission of evidence of the uncharged sex offense may have added to the evidence the jury could consider as to the defendant's guilt' " on the currently charged sex offense. (*Id.* at p. 920.) Appellant calls our attention to *Marshall v. Lonberger* (1983) 459 U.S. 422, 438, footnote 6 [103 S.Ct. 843, 853, 74 L.Ed.2d 646], and *Spencer v. Texas* (1967) 385 U.S. 554, 564-565 [87 S.Ct. 648, 653-654, 17 L.Ed.2d 606]. We see nothing in these cases about any constitutional rule of law prohibiting the admission of evidence of a defendant's disposition. Indeed, footnote 6 of *Marshall* states in part: "[T]he common law, like our decision in *Spencer,* implicitly recognized that any unfairness resulting from admitting prior convictions was more often than not balanced by its probative value and permitted the prosecution to introduce such evidence without demanding any particularly strong justification." (*Marshall v. Lonberger, supra,* 459 U.S. at pp. 438-439, fn. 6 [103 S.Ct. at p. 853].) The court in *Marshall* also observed that "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." (*Id.* at p. 438, fn. 6 [103 S.Ct. at p. 853].) Appellant also cites *Estelle v. McGuire* (1991) 502 U.S. 62 [112 S.Ct. 475, 116 L.Ed.2d 385], and *Old Chief v. United States* (1997) 519 U.S. 172 [117 S.Ct. 644, 136 L.Ed.2d 574]. These cases likewise do not help him. In *Estelle* the court stated "we express no opinion on

whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime." (*Estelle v. McGuire, supra,* 502 U.S. at p. 75, fn. 5 [112 S.Ct. at p. 484].) The *Old Chief* case involved an interpretation of rule 403 of the Federal Rules of Evidence (28 U.S.C.). It does not purport to state any constitutional prohibition against the use of propensity evidence.

Elsewhere in his brief appellant raises what appears to be a third argument against the instruction—that it "tells the jurors they may convict based on disposition *alone*" and that it "allowed the jury to convict even if the nondisposition evidence left them with a reasonable doubt as to appellant's guilt." We addressed and rejected this same argument in *People v. Van Winkle* (1999) 75 Cal.App.4th 133 [89 Cal.Rptr.2d 28]. We reject it again here. As we pointed out in *Van Winkle,* the jury was instructed there, just as it was here, that it could not convict the defendant unless it found him guilty beyond a reasonable doubt of the crime charged. (See CALJIC No. 2.90.) We expressed the view in *Van Winkle* that there was no reasonable likelihood that a jury would read the pre-1999 CALJIC No. 2.50.01 instruction as permitting a finding of guilt on the current charge on any evidentiary showing less than proof beyond a reasonable doubt of guilt of the currently charged crime. We concluded that CALJIC No. 2.90, together with the instructions given on the elements of each offense, was sufficient to convey to the jury that "the prosecution still had the burden of proving every element beyond a reasonable doubt and the jury could not convict defendant *solely* on the proof of the other crimes." (*People v. Van Winkle, supra,* 75 Cal.App.4th at p. 148.)

At oral argument, appellant urged us to overrule *Van Winkle,* and to follow a subsequent decision of Division Two of the Second District, *People v. Vichroy, supra,* 76 Cal.App.4th 92. We decline to do so. *Vichroy* viewed the instruction as telling the jurors "that they could convict appellant of the current charges based solely upon their determination that he had committed prior sexual offenses." (*People v. Vichroy, supra,* 76 Cal.App.4th at p. 99.) Appellant likewise urges us to read the instruction as if it said: "If you find that the defendant had this disposition, you may, but are not required to, infer solely from this evidence of a prior sexual offense that the defendant is guilty beyond a reasonable doubt of the crime[s] of which he is presently accused." We think this is a strained and untenable reading of CALJIC No. 2.50.01. In order to make this inference, a juror would have to conclude that a defendant could be found guilty beyond a reasonable doubt of the currently charged crime even if no evidence whatsoever had been presented to prove the elements of the charged offense.

In the present case, for example, appellant was found guilty of two counts of forcible rape. The jury was told: "In order to prove this crime, each of the

following elements must be proved: One, a male and female engaged in an act of sexual intercourse; Two, the two persons were not married to each other at the time of the act of sexual intercourse; Three, the act of intercourse was against the will of the alleged victim; Four, the act was accomplished by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the alleged victim." (See CALJIC No. 10.00.) The jury was further instructed that the People had the burden to "prove beyond a reasonable doubt every essential element of the charges against" the defendant. (CALJIC No. 2.61.) The jury was further told: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt." (CALJIC No. 2.90.) The jury was further instructed on the definition of "reasonable doubt." (*Ibid.*) Appellant argues that the pre-1999 CALJIC No. 2.50.01 instruction allowed the jury to convict appellant of rape with no evidence of sexual intercourse with Melanie V. (or with anyone), no evidence that he and Melanie V. were not married, no evidence that an act of sexual intercourse was against the will of Melanie V., and no evidence that an act of sexual intercourse was accomplished by means of force, violence, etc. Appellant argues that if the jury found by a preponderance of the evidence that he committed the crime of indecent exposure in January 1995, CALJIC No. 2.50.01 told the jurors that they may deem this 1995 evidence alone to constitute proof beyond a reasonable doubt that he raped Melanie V. in 1997. We are not of the view that there is "a reasonable likelihood" the jury's understanding of CALJIC No. 2.50.01 was as appellant asserts. (*People v. Cain* (1995) 10 Cal.4th 1, 36 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)[7] Nor, of course, did the prosecutor make any argument that the 1995 indecent exposure evidence could constitute proof beyond a reasonable doubt of the 1997 crimes. Appellant has therefore shown no error.

---

[7]As we pointed out in *Van Winkle,* the 1999 revision to CALJIC No. 2.50.01 added the following language to the instruction: "However, if you find [by a preponderance of the evidence] that the defendant committed [a] prior sexual offense[s], that is not sufficient by itself to prove [beyond a reasonable doubt] that [he] [she] committed the charged crime[s]. The weight and significance of the evidence, if any, are for you to decide." (CALJIC No. 2.50.01 (1999 rev.); see also *People v. Van Winkle, supra,* 75 Cal.App.4th at pp. 147-148, fn. 12.) This revision appears to eliminate any possibility, however improbable, that a jury might use evidence of a prior sexual offense in the manner appellant contends his jury may have used the evidence of his 1995 act of indecent exposure. (See *People v. Falsetta, supra,* 21 Cal.4th at pp. 922-924.) This revision was of course not made until after appellant's January 1998 trial. At oral argument on this appeal, appellant's counsel contended that *Falsetta* suggests or implies that the pre-1999 version of CALJIC No. 2.50.01 was infirm. We see no such suggestion in *Falsetta. Falsetta* did not address any issue at all pertaining to the pre-1999 CALJIC No.2.50.01. The *Falsetta* opinion was filed on November 1, 1999. It made no mention of *Van Winkle,* which had been decided 36 days earlier. *Vichroy* was decided later in November of 1999.

## III.*

### *The Court Did Not Err in Not Instructing the Jury on the Crime of False Imprisonment*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV.

### DISPOSITION

Appellant's convictions are affirmed. The case is remanded to the superior court so that appellant can be resentenced as the trial court deems appropriate, but without the erroneously imposed section 667, subdivision (a) enhancement.

Thaxter, J., and Levy, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 2, 2000. Kennard, J., was of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1065.