[No. A083235. First Dist., Div. Three. Nov. 27, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
DARRELL YOUNGER, Defendant and Appellant.

**COUNSEL**

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and John R. Vance, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PARRILLI, J.**—A young woman is found in her bathtub, strangled by a noose tied to the showerhead. Though she has been dead for nearly two weeks, the pathologist who performs the autopsy is able to determine that there are no significant bruises or other injuries aside from the strangulation. The victim's artificial fingernails are all in place, and there is no sign of a struggle. The pathologist lists the cause of death as hanging, but notes that drowning or other asphyxial death cannot be ruled out. The district attorney charges the woman's ex-boyfriend with murder. He has told the police that after he broke up with her, the woman ran into the bathroom and he left with their children in her car. His statements to various witnesses before and after the time of death are suspicious. Nevertheless, a highly qualified pathologist testifies that the physical evidence strongly supports a finding of suicide, not homicide.

The jury hears evidence of domestic abuse inflicted by the boyfriend on the victim and two other partners in the past. The jury is instructed that if it finds the boyfriend committed prior offenses involving domestic violence, it may infer that he was disposed toward domestic violence, and further "infer that he was likely to commit and did commit the crime of which he is accused." The instruction does not caution the jury that the prior offenses are insufficient by themselves to prove guilt of the charged offense. The jury finds the boyfriend guilty of murder and car theft.

We reverse the murder conviction. When the evidence of the charged offense is as ambiguous as it is here, inviting the jury to infer guilt from prior offenses raises a serious question whether the verdict was affected by a faulty inference of guilt from propensity. We cannot say beyond a reasonable doubt that the error in the instruction was unimportant in relation to everything else the jury considered. (*People v. James* (2000) 81 Cal.App.4th 1343, 1362-1363 [96 Cal.Rptr.2d 823]; *Yates v. Evatt* (1991) 500 U.S. 391, 404-405 [111 S.Ct. 1884, 1893-1894, 114 L.Ed.2d 432].)

### BACKGROUND

1. *Heather Moore's Relationships with Her Family and with Darrell Younger*

Heather Moore was the victim in this case. Darrell Younger, the defendant, met Heather's parents while he and they were working as fruit packers in California. In the spring of 1990, the Moores let him stay in their home in Medford, Oregon for a couple of months. Heather was 16 years old and a

sophomore in high school; Younger was 28 or 29. While he was staying with the Moores, Heather developed a romantic interest in Younger.

Heather's mother testified that she never had any trouble with her daughter until Heather's sophomore year. Her grades began to drop, then seemed to get better, but her mother discovered Heather had learned how to access the school computer to raise her grades and cover up her absences. After catching Heather in more and more lies, her mother became frustrated and whipped Heather with a leather strap. Heather ran away from home that day, and ended up in counseling through child protective services. In a report dated January 4, 1990, a counselor noted that Heather said her parents used and sold marijuana, her father injected cocaine and "crank" and had spent time in jail for theft, her parents split up for a few months the past summer, and her mother nearly had a nervous breakdown. Heather said her parents were excessively strict with her and accused her of drug use and sexual promiscuity. She said she had no relationship with either parent. She had decided to skip school and got caught, and ran away after her mother whipped her with horse reins.

The counselor rated Heather 5 on a scale of 5 for depression, excessive sadness, or crying. Heather also rated 5 out of 5 for fearful or anxious behavior and for withdrawn or isolating behavior. Heather went home with her mother after this episode. She continued with counseling at the agency, however. On a second evaluation dated February 20, 1990, Heather was rated 4 out of 5 for depression, 4 out of 5 for anxiety, and 5 out of 5 for isolation. Her mother testified that Heather never threatened to kill herself. Her paternal grandfather had committed suicide, and Heather's parents had discussed this with their children, telling them that was no way to handle a problem.

In the summer of 1990 the family went to California to pack pears. After Heather got into an argument with her parents, her friend Nina Marlow drove her to Davis, where Younger was living with his parents. Eventually, Heather turned up at her maternal uncle's house in Sonora. She never returned to high school. In September, she ran away from home again and stayed with her paternal aunt, who lived near her parents in Medford. The Moores moved to Colorado that month. According to Heather's mother, they delayed their move to look for Heather, but couldn't find her. They were not associating with the aunt at that time, but asked the police to check the aunt's house. According to the aunt, Heather's parents moved without telling her or Heather. The aunt said she wasn't hiding Heather. She and Heather had driven by the Moores' house, and saw them packing their motor home. Heather had very little communication with her mother after that, and never saw her again.

Heather eventually left her aunt's house with Younger. They lived together for the next five years, with some periods of separation. They moved frequently. In 1992 and 1993, they had an apartment in Redding. A son, Shane, was born in March 1992. Nina Marlow, who visited frequently, saw bruises on Heather's arms, legs, and back during this time. In April 1993, Heather called the Redding Police Department to report an assault by Younger. She said they had argued about his drinking. He slapped her, she scratched him, and then he hit her in the head with his fists. The responding officer took pictures of raised bruises on her face. Younger had left the apartment. Heather said he had tried to take the child with him at first. During a follow-up investigation, Younger denied punching Heather. He said he only pushed her when she was scratching him, which caused her to bump her head. Younger had scratches on his forearm. Heather said she didn't want the case to be prosecuted, and it was not. After this incident, Heather went to stay with her aunt in Medford for about three weeks. She had a large bruise above her eye, and a bruise on her arm. She made some plans to stay in Medford, but then went back to Younger. She was pregnant with their second child. In August 1993 another son, Aaron, was born.

According to Younger's sister, Antoinette Borbon, Heather started many fights with Younger, throwing things at him, grabbing him by the hair, scratching him, and threatening to kill him. When they separated, Borbon said Heather always became depressed and begged Younger to come back because she did not know what to do without him. This happened four or five times. However, Antoinette said Heather never threatened to kill herself.

In July 1995, Heather and Younger were living in Oroville. Heather called the police early one morning, and reported that Younger had assaulted and threatened her throughout the past night after she asked him to move out. He had grabbed her by the throat and the hair, thrown her to the floor, and kicked her repeatedly. She had been unable to call the police. At one point, she made it out to her car, but returned because she was afraid for the children. After she went to bed with the children, Younger came in and raped her, while choking her and threatening to kill her and take the children. He had left in the morning, and she was afraid of what he would do when he came back. The officer responding to Heather's call saw bruises on her neck. Two days later Younger did return, and kicked in the door to the apartment, breaking the hinges from the frame. Oroville police officers interviewed Younger that day at the police department. He denied assaulting Heather, and said she had attacked him. He had pushed her away, and she fell into a chair. He said Heather had refused to have sex with him, and he had gone to sleep.

Heather was examined at the hospital. The doctor observed bruising on her neck and hip. A sexual assault examination revealed no evidence of rape,

though possible ejaculate was found on Heather's pubic hair. Subsequently, Heather wrote the district attorney to explain that she did not know that rape required penetration, and that Younger had not penetrated her. She asked the district attorney to drop the rape charge, but she still wanted the spousal abuse charge to be prosecuted. Younger spent some time in the Oroville jail as a result of this incident.[1]

Meanwhile, Heather ran out of money and was evicted from the apartment in Oroville. Her uncle in Sonora sent her a check on September 16, 1995, for $2,000. This was an advance distribution from the estate of her maternal grandfather, who had died the previous June. In May 1995, her uncle had told Heather she could expect to inherit a sum of over $50,000. Her uncle testified that he stepped in as an adviser after Heather became destitute in Oroville, because she did not know how to live on her own and did not trust her own ability. He suggested that she move to Santa Rosa, get a job with flexible hours, and enroll in Santa Rosa Junior College.

### 2. Heather and Younger in Santa Rosa

Nina Marlow helped Heather move to Santa Rosa. They rented an apartment in Nina's name because she had good credit and Heather had just been evicted. Nina stayed with Heather and the children for two and a half weeks in late September and early October, then went back to Medford. Heather told Nina she no longer cared for Younger, and did not want him back. Heather had written to Younger while he was in jail, telling him their relationship was over but she wanted to live near him so he could see the children. However, she also wrote "I'll love you forever, I'll always be here for you, I just want to hold you, if coming back home is necessary to your getting out of there, just tell them that it's okay, that I'll take you back."

When Younger got out of jail, he went to his parents' home in Davis. Tiffany Waldren, another of his sisters, testified that Younger told her it was Heather's fault he had gone to jail, he hated her for it, and she was going to pay for it. Heather made numerous phone calls to Younger in Davis early in October. Soon thereafter she went to Davis and brought him back to Santa Rosa with her. She told Nina Marlow that Younger was only moving back to watch the children while Heather was at work.

On November 13, 1995, Heather began working as a hostess in a Lyon's restaurant. She asked to work nights so she could have the days with her

[1]The jury did not learn about his conviction of a misdemeanor for willful infliction of injury on a cohabitant. However, it did hear that he was in jail for a time immediately after the Oroville incident.

children. She worked full-time, often showing up early to help out before her shift began. Her managers considered her an outstanding employee, and told her she would be promoted to a server position when they could find a replacement hostess. Heather was scheduled to work the nights of December 22 through 24, and to have the next two days off.

Other employees testified that Heather spoke often about her children, to whom she was devoted, and mentioned her inheritance and her plans to go to school and move from her apartment. She said she was separating from her boyfriend, who was living with her to help with the children and the rent. A week or two before Christmas, Heather and a coworker went Christmas shopping, and Heather spent $200 to $250 on toys for her children. She was thinking of spending Christmas with her brother in San Jose. However, when her brother spoke to her shortly before Christmas, she had made no plans to visit.

Another hostess noticed bruises on Heather. When a male coworker asked her out, Heather expressed interest but did not want to give him her number because her ex-boyfriend was living with her. Her coworker gave her his number, but she never called. Heather also took phone numbers from two customers. One said he would go Christmas shopping with her, but when she called he was unable to go. She visited another briefly at his apartment. He noticed she had a bruise on her forehead.

On November 28, 1995, Younger began working at a tire shop. He also was considered an outstanding employee by his managers. Younger spoke often at work about the problems he was having at home. One of the owners of the shop found Younger looking up lawyers in the yellow pages, and asked him why. Younger said he wanted to get custody of his children. He had come home and found them alone, locked in a bedroom, with dirty diapers. He said his girlfriend threw things at him, and bit him. He showed the owner a bite mark on his back. He said that after having their second child, his girlfriend had hormone problems. She had falsely accused him of abusing her. He wanted to get his children out of the situation, but was concerned for his girlfriend, who had threatened to commit suicide if he left. He suspected his girlfriend of prostituting herself during the day. The owner obtained a referral to a lawyer for Younger. He did not know if Younger followed up. Younger made similar comments to his supervisor and to another owner of the shop. A coworker testified that one day Younger looked upset, and he asked Younger what was going on. Younger asked what he would do if he caught his wife hooking. The coworker said he would probably take his kid and leave. Younger said, "I think I'd kill the bitch."

Younger called Heather's managers at Lyon's and accused her of stealing from the cash register. They audited the register after her shift and found no discrepancies. Younger called the general manager a number of times demanding information about Heather, which the manager refused to give. Younger would become angry, threaten to come down and kick the manager's butt, and ask him whether he was running a whorehouse or a restaurant. Younger also found the phone numbers Heather got from men and called them. He told them, or their roommates when the roommates answered the phone, that he suspected his girlfriend of seeing other people and that he wanted custody of his children. To the coworker who had asked Heather out, Younger said on one occasion: "Remember O.J. . . . . No. I'm just playing."

On the weekend of December 16 and 17, 1995, Nina Marlow and her boyfriend visited Heather in Santa Rosa. Younger was away. Heather was looking forward to going to school and to Younger moving out. She wanted him to move in December but had given him a couple of more weeks to find a place. He was looking for an apartment with a friend. Heather was not depressed about Younger leaving, according to Nina. Heather had to work around Christmas but was happy she had a job and was able to buy the children lots of toys.

On that same weekend, Younger visited his sister Antoinette. They talked about going to Tahoe for Christmas, just the two of them and Antoinette's children. He also saw his sister Michelle Pirc that weekend. Michelle testified that Younger jokingly asked if she would get an ID in Heather's name, because she resembled Heather and could claim her inheritance. He said he would give Michelle $20,000. Michelle did not take him seriously, because he was clearly joking and was always thinking of schemes to make money. It was a brief comment, and was not mentioned again. Michelle had heard Younger refer to the inheritance before, but Heather talked about it more than he did.

On December 19, Heather learned that her son Shane had been accepted in a childcare program at Santa Rosa Junior College. Aaron, the younger child, was on a waiting list. Heather had applied for the program on October 3. It was free for families on welfare, like Heather's. The employee who called Heather with the news remembered that Heather was very excited about it.

Sometime in the weeks before Christmas, Heather had told her grandmother in Colorado that she had given Younger until April 15 to move out. On December 20, her grandmother called and Younger answered the phone. Heather was at work. Younger told her grandmother that Heather wanted

him out, and he thought she was having an affair, but he didn't want to leave. He talked for quite a while about how pretty Heather was, and about the man whose phone number he had found. Younger made similar comments to two of Heather's friends who called the apartment during December, and who described his mood as "sad" or "depressed." Heather's grandmother called and spoke to Heather briefly on December 21.

Heather worked a shift from 5:00 p.m. on December 21 to 1:00 a.m. on December 22. She was scheduled to work again at 8:00 o'clock the following evening, but for the first time she failed to appear. She never came to work again. Her managers telephoned her several times but were unable to get an answer.

On December 22, Younger stopped by the tire shop to pick up his paycheck. He was driving a Sterling automobile, which his employer had seen him drive before. He had the two children with him, and told his employer they were going to spend Christmas with his sister. His employer walked out to the car and spoke to the children, who were in the back seat. He talked to them about being ready for Santa Claus, and the older one responded. Everything seemed normal, and Younger seemed relieved to be getting out of his troubled domestic situation. The car was neither packed full nor empty; it had the things you would expect to see on a trip with children. Younger was scheduled to work on December 26, but he never returned to work, nor did he call to say he wouldn't be in.

3.  *Younger on His Own with the Children*

On the afternoon of December 22, Younger arrived unannounced at his sister Michelle's house, with the children in the car. He said he had left Heather. At first he said she didn't know they had left; later he said she had told him to take the children and leave. Michelle said it was very common for her family members to show up without calling ahead. Michelle's husband testified that he had not been surprised to see Younger, because he had come by unannounced with the children on other occasions. Michelle said the Sterling was a "family car" except "when Heather was mad at him and then it became her car." The car was registered in Heather's name.

Younger's sister Antoinette was at Michelle's, and was surprised to see Younger. He had left her a message during the past week, which she didn't remember though she was sure he hadn't mentioned bringing the children or the car. Antoinette testified that whenever Younger and Heather separated, he would talk about getting custody of the children, but would say Heather would never let him take them. On December 22, Younger told Antoinette

that Heather was going to her brother's for Christmas, they had gotten into an argument, he had "grabbed the boys and left her in the bathroom crying and he was never going back to her again." He showed Antoinette a human bite mark on his back that was "pretty fresh," and some scratches. Most of the clothes he had were his; there were only a few things of the children's. He indicated that their departure had been "pretty spontaneous."

On December 23, Younger called Heather's manager at Lyon's, asking if he knew where she was. Younger said she hadn't come home, and angrily said to tell her she had better get in touch with him if she wanted to see her kids again. Then, however, he calmed down and indicated he didn't really mean it. Ordinarily, Younger would stay mad and the manager would hang up on him.

Younger spent the nights around Christmas at Antoinette's, except for Christmas Eve, which he spent at Michelle's. Younger's sister Tiffany testified that on Christmas Day at Michelle's, he told her different stories about what had happened with Heather. Once he said he had left during an argument. Heather had told him to leave, he told her he was taking the children, and she locked herself in the bathroom. Another time he said she had hugged him and the children good-bye outside when the kids were in the car. He also told Tiffany he had left a note for Heather, on a number of pages spread out on a table. Once he said he wrote the note and left after Heather ran into the bathroom. Another time he said Heather read over the note, then ran into the bathroom. Michelle asked why Heather had not called. Younger said the kids "don't have a mom anymore, and she doesn't care." Younger seemed worried about the children, and told Tiffany he wanted her to be like a mom for them. Tiffany heard him say he couldn't believe Heather hadn't called on Christmas.

On one occasion during the holidays when Antoinette reprimanded Younger's children, he said "don't be mean to them, because they don't have a mom anymore." Antoinette thought it strange that Heather was not calling, and asked Younger about that. He said he couldn't get hold of Heather. Antoinette saw him dialing the phone a couple of times. She offered to call herself, but Younger said Heather wouldn't speak to her, and she shouldn't get involved. On December 28, friends of Antoinette's came over and they all drank beer and had a discussion about dreams. After others related their dreams, Younger said "you know what I dreamt last night . . . I dreamt I killed Heather." He said nothing else, and went up to bed after a few minutes.

On December 29, Younger said he needed to go to Santa Rosa to pick up his last paycheck and get some things for his boys. Antoinette offered to go

along, but he did not want a confrontation between her and Heather. He suggested she stay with the boys in a restaurant while he went to the apartment, but in the end Antoinette got sick and couldn't go. She told Younger he should go back to Heather. He told Antoinette she didn't understand what it was like, that he couldn't go back and didn't want to go back. He went off with the boys in the car. Aaron's car seat stuck up in the front passenger seat, high enough to see it if you were driving by or standing outside the car.

On either the 26th or the 29th of December, the assistant manager of the apartments where Heather lived was cleaning up around the dumpsters. He noticed Younger driving through the parking lot in the Sterling. No one else was in the car. The assistant manager waved to Younger, and Younger waved back. Instead of parking and running up the stairs to the apartment as he usually did, Younger kept driving and left the lot. The assistant manager did not see him again that day.

Younger spent the nights of the 29th and 30th at his sister Tiffany's. When she came home on one of those nights, Tiffany found a letter from Younger thanking her, and saying he was in a terrible situation and needed help with the boys. The next morning, he tore the note up and threw it away.

On December 31, Younger asked Antoinette if he and the boys could spend one more night with her. She said no. He came to her apartment in the Sterling, and was angry. When she came out to get her key from him, he began crying and said he had nowhere to go. He told her to look at the babies, they didn't have a mother any more, and he didn't know what he was going to do. Antoinette told him to go back to Santa Rosa, because Heather would never kick him and the kids out on the street. Younger said he couldn't do that, and that Antoinette didn't understand why. She said she couldn't help him any more.

In the period between Christmas and New Year's Eve, Younger also spoke to Ramona Taylor, a former girlfriend. He told Taylor he had taken the children because Heather had been neglecting them, but said they would get back together if Heather would get help with her parenting. According to Taylor, to whom Younger would return whenever he separated from Heather, Heather and Younger "were very codependent on each other." She never heard Heather say she would commit suicide if Younger left her, but during the last few years of the relationship she heard Antoinette and Younger say that about Heather. Taylor had lived with Antoinette in the apartment complex in Davis where Younger's parents also resided. Taylor said that Antoinette, Michelle, and Younger's mother were not truthful or trustworthy people. She did not know Tiffany well.

Younger's mother and sisters, and Nina Marlow, all testified that Heather was a good mother who never abused her children.

## 4.  *The Discovery of the Body*

On January 4, 1996, the manager and assistant manager of the apartments in Santa Rosa went to Heather's unit. She had not paid her rent on the first, as she always had before. All her things were gone from her balcony, and they hadn't seen her for a while. They thought she might have "skipped." There was a strong odor when they entered the apartment. They called the police.

There was no sign of a forced entry. The thermostat was at around 70 degrees. The apartment was fairly clean, but it appeared no one had been there for some time. There were dead flowers in a vase, and a foul odor in the air. There was no Christmas tree or other holiday decoration. The bathroom door was locked. An officer opened it by poking a screwdriver into the doorknob and turning it. It was a typical internal doorknob that could be locked by twisting the locking mechanism on the inside, then closing the door. They found Heather's body sitting up in the bathtub, clad in a brassiere, panties, and socks, with a rope around her neck that was tied to the shower head above her. The rope was taut. The legs were stretched out in front of the body, and the back was against the faucet. The buttocks were in contact with the bathtub. The police found no other rope in the apartment. Nor did they find any alcoholic beverage.

The left side of Heather's body faced the side of the tub against the wall. The noose was formed with a simple slip knot at the corner of the jaw near the left ear. Heather wore her hair shoulder or chin length, and some hair was caught both under the noose and in the slip knot itself. The rope was tied to the showerhead so that the loose end pointed out toward the room, on the left side of the shower head if one were facing the showerhead. Heather's artificial fingernails were undamaged. Nothing significant was found beneath them except for a hair identified as Heather's. Her hair was also found between her fingers. Some of Younger's hair was found on the bathroom rug, but none on the corpse or in the rope. The shower rod and curtain were in place and undamaged. In the vanity cabinet beneath the sink were a pair of sweat pants, a tank top, and Heather's purse.

On the dining room table were five envelopes with a letter written on them, spread out from left to right. In the note Younger blamed Heather for lying to him, abusing the children, and falsely accusing him of hitting and raping her. He said he was taking the children, adding "[y]ou know I can get

costudy [*sic*] when I tell them how you lock them in the room all the time I am gone to work." He asked her repeatedly to "get help." He said that even though he loved her, he could never come back to her because she could not be faithful to anyone. There were no signs of a struggle in the apartment. A Woods lamp, which detects body fluid residues, was deployed with negative results. Younger's fingerprints were found on two of the envelopes on the table, the outside of the bathroom door, a telephone, and a jar in the kitchen sink.

### 5.  *Younger's Interviews with the Police*

The Santa Rosa police interviewed Younger.in Davis on January 6, 1996. They told him they wanted to talk about the situation with his children. He said he would come home in Santa Rosa to find them locked in a room with dirty diapers, that their mother had been threatening suicide, and that a lawyer had advised him to take the children. He said Heather had lied about the incident in Oroville that sent him to jail. In Santa Rosa, she had started "chasing guys" and didn't take care of the kids. He had called Lyon's to check on her hours, but they lied for her and would not give him her schedule. He said Heather frequently threatened suicide, but he didn't think she would actually do it. He last saw her the Friday before Christmas. He had written her a note the night before, while she was at work. On Friday morning, he told her he was taking the children, would be getting full custody, and she would not see them again unless she got counseling. They hugged and kissed. He said he needed the car for the kids. She threw him her keys, he took the car key off the ring, she ran into the bathroom and slammed the door, and he left with the children.

When the police asked about Heather's purse, Younger said he didn't have it, but would check the car again if Heather said it was there. When they told him a woman suspected to be Heather was found dead in the apartment, Younger said it wasn't Heather. He said they could probably get hold of her through her brother. Under further questioning, he said Heather had just taken a bath and started to get dressed, and was wearing her underwear when he left. When asked what means Heather might have used to commit suicide, Younger mentioned that she had once threatened to take a whole bottle of pills. The police asked if there were pills in the house. Younger said he had painkillers but didn't know if any were left. He didn't know of any rope in the apartment, except for little ropes the kids used to pull their toys.

Younger's mother picked him up at the police station after the interview. She testified that he "was . . . behaving weird" and "seemed to be angry." He told her he didn't want to cry in front of the boys. He had his mother call

Heather's family in Colorado to see if she was there. Younger also saw his sister Tiffany that day, and spent the next few days with her. She saw him buying beer after he came back from the police station. Tiffany asked about Heather. She thought Heather had turned Younger in for kidnapping the children, and wanted to call her. Younger told Tiffany Heather was dead. However, he also said it wasn't Heather, and the body hadn't been identified yet. He said the police had asked him about pills, and Heather might have killed herself with them. He appeared "kind of emotionless, just off in another world." That night, Tiffany overheard Younger asking Shane about what Shane had told the police that day at the station. The children cried for their mother frequently. Younger would comfort them.

Younger stayed with Ramona Taylor for about two months beginning in February of 1996. His children had been taken away from him. He cried every night because he missed his children, and Heather also. Taylor said, "[d]uring the day it was just trying to figure out how this happened and who would do this. And usually when he cried it was at night." Younger said he only wanted his children, not Heather's inheritance. He also said Heather had learned she wouldn't be getting any money.

Younger had another interview with the police on March 7. He was very interested in getting some letters back from the police, which he said would show Heather had fabricated the charges against him in Oroville. Younger was upset about losing his children, and blamed his mother and sisters for making false statements about him to the police. He said Heather had told him her inheritance was not going to come through because her aunt was suing the estate and the lawyers took the money. Younger told the police Heather had not been drinking the morning he left. He denied ever saying to his sisters that the children didn't have a mother; that was a "whopper." He denied driving by the apartment after Christmas. He admitted bringing up O.J. in a conversation with Heather's coworker, but said he was only "kiddin' around." He admitted talking about a dream in which he killed Heather, but said that was well before Christmas, just after he got out of jail. In the dream, people were telling him he had killed her, saying he had punched her and she had fallen against something. He said he had asked Michelle about a false identification, but it was Heather's idea to have Michelle cash Heather's welfare check so that Heather could claim she never got it.

Younger admitted hitting his former wife, Cara Cobb, who was strong and "would fight just like a man." He was married to her in 1984 and 1985. He also admitted grabbing and pushing Ramona Taylor once when she called Heather a whore. Younger denied strangling Taylor; he said he only grabbed

her and pushed her against the wall. The jury listened to tapes of both interviews.

### 6. *The Prior Incidents of Domestic Violence Against Other Victims*

Cobb, now Cara Sutton, and Taylor testified at trial. Sutton said that Younger attacked her one time when she threatened to stop making payments on his Harley Davidson. He jumped on her when she was on the bed, and put a pillow over her head as she lay on her stomach. She squirmed away, but he grabbed her neck and began choking her. She was still facedown. She tried to call to Younger's sister Antoinette, who was in the apartment, but could not speak. At that point, Antoinette came down the hall saying "leave her alone" and Tiffany knocked on the front door. Younger released Sutton. Tiffany was coming over to beat Sutton up, because Sutton had hung up on her during a discussion on the telephone about Younger's family stealing his truck. Sutton did not report this incident to the police, but she left Younger the same night. She didn't remember any marks inflicted by the attack, but said "I'm sure my neck was red." Antoinette testified that she had been with Tiffany when Tiffany went to confront Sutton. Younger had met them at the door and told them to leave because Sutton was going to call the police. Antoinette was never in the apartment during a fight between Younger and Sutton.

Taylor testified that she had an extended relationship with Younger, and had lived with him from January until May of 1990. Younger had assaulted her twice. The first time, Heather was staying in Davis with Younger's parents and Taylor was staying with Antoinette in the same apartment complex. Taylor lost her temper and called Heather a bitch. Younger angrily shoved Taylor against the wall with his hand on her throat, near the collarbone, causing her to knock Antoinette's son to the floor.

The second occasion was in January of 1991. Taylor was babysitting Antoinette's children, who were twins about three and a half years old. She was taking Percodan while recovering from surgery. Younger came over and accused her of not taking care of the children. He said he would take them. Taylor refused, because she knew Younger had been drinking. He picked the children up and headed for the door. Taylor slapped him in the face and took one of the children. Younger took the other child to his parents' and returned. They argued, and he hit Taylor on her legs as she was sitting on the couch with her feet on a coffee table. She got up to get away, and he hit her on the side of the head, knocking her out. When she came to, he was apologizing. She took the other child to Younger's parents, told them what he had done, and went back to Antoinette's, "calling him every name in the

book." She grabbed a small tree and hit him with it, telling him to leave her alone. He followed her back to Antoinette's, where they got into an argument. When she started to walk away from him, Younger grabbed her throat from behind, choking her so hard she couldn't breathe or speak. He said, "I'll kill you and throw your body in the river and no one will ever find you." Then he stopped. There were bruises on her neck. Taylor slept with Younger that night; he was very apologetic, and said they could go to couples counseling in Oregon, where she was going the next day. However, the next day he did not accompany her to Oregon.

### 7. Testimony Regarding Knots

The prosecution called Fred Amos, a Coast Guard officer, as a knot expert. Amos testified that the knot around the shower head had elements of different knots, but "as a whole it's not any one type of knot that I can identify." The rope was a braided polyester or nylon type that was small in diameter but quite strong, capable of stretching to 50 percent of its normal length under a maximum load. Amos had recreated the knot, and discovered that in order to replicate its wraps he had to apply some tension to the loose end, though only a small amount of pressure was needed. He acknowledged that the knot may have tightened on the shower head after it was tied. He said it was tied with "good mechanics," in that it was tied with a limited amount of rope in a manner that was tight but could be untied, though it was also "overtied" in that there were more wraps than necessary. Amos also replicated the slip knot, which was a knot he never used. He was unable to tie it behind his neck. He did not try tying it near his left ear. The slip knot was tied so that a pull on the loose, or "bitter" end, would cause the knot to come undone. It could be tied loosely, then tightened as pressure was applied.

Heather's mother testified that Heather grew up riding horses. She was familiar with a slip knot for tying reins or a rope to a rail. This knot could be quickly released by pulling on one end if the horse became tangled. Younger was a fisherman, who sometimes tied his own flies. A defense expert testified that none of the knots in the rope around the showerhead were used in fishing, though the slip knot might be the beginning of a useful knot. Younger's brother testified that once when Younger was helping him move, Younger was so bad at tying down the load in a pickup that his brother had to go back and knot the rope himself.

### 8. The Pathologists' Testimony

The autopsy was performed by Dr. A. Jay Chapman, an experienced forensic pathologist who had performed several thousand autopsies including over 500 suicides. His report noted that Heather's corpse was in a

moderately advanced state of decomposition. While minor injuries may have been obscured by the process of decomposition, Dr. Chapman testified that any significant injuries, including bruising, would still have been discernible. He found no injuries other than the furrow around the neck created by the noose. Heather's liver tissue contained .14 percent alcohol, but it could not be determined whether she had been drinking because alcohol is a byproduct of putrefaction.

Dr. Chapman was unable to identify a cause of death with certainty. His report stated the death was consistent with hanging, but noted that drowning or other asphyxial death could not be ruled out. Dr. Chapman mentioned drowning only because the body was in a bathtub. There was no water in the lungs, but some drownings involve a pharyngeal spasm that prevents water from entering the lungs. Dr. Chapman had been reminded of a notorious series of murders in England that were accomplished by pulling a bathing person's heels into the air, submerging the head and torso in the tub. He testified that in Heather's case, manual strangulation was not impossible but was highly unlikely due to the absence of any of the typical injuries a struggle would have caused, or any hemorrhaging in the throat, or any broken blood vessels in the face or eyes. He found none of the injuries to the lips that characterize death by smothering.

Dr. Chapman said he "absolutely" could not rule out suicide in this case. Homicidal hangings are rare, as are homicidal smotherings. However, Dr. Chapman believed several factors pointed toward homicide instead of self-induced hanging: the fact that hair was caught up in the slip knot, which meant the knot was tied near the hair on the side of the head; the length of the rope, because most people would think a shorter rope was needed to achieve partial suspension of the body; the position of the body with the legs straight out instead of in a kneeling position, because a kneeling position is more typical for a suicide; the absence of marks on the back from the tub fixtures, which would have been left if Heather had slid down the wall under the shower head; the fact that Heather was wearing her underwear, whereas most women who commit suicide avoid being found in an embarrassing situation; and the fact that the furrow around Heather's neck was slightly more horizontal and less V-shaped than is the case in most suicides.

The defense called Dr. Robert Lawrence, a pathologist for the San Joaquin County Coroner's Office. Dr. Lawrence had performed around 7,000 autopsies, including at least 500 suicides and 100 suicides by hanging. He had never seen a homicidal hanging, and testified that making a homicide look like a suicide by hanging is "quite difficult." After examining Dr. Chapman's report and preliminary hearing testimony, the coroner's investigative

and toxicology reports, and photographs of the scene, Dr. Lawrence concluded Heather had committed suicide. He saw nothing to indicate homicide, and "frankly could not understand why it was being considered as a homicide." He was acquainted with Dr. Chapman, and had spoken with him about the case.

Dr. Lawrence had seen several suicides by hanging in which hair was entangled in the knot, including one shown in a photograph in his files. He had seen suicides in all "stages of clothing," and it did not seem suspicious to him that Heather was wearing her underwear. He "found it surprising" that Dr. Chapman placed significance on the length of the rope. Dr. Lawrence thought the length was what it would have been if Heather simply raised herself up, tied the knot as quickly as she could, and relaxed enough to hang herself. He had seen many suicides "essentially identical to this," where the person was seated as Heather was. He thought she would have avoided the pain that scraping her back against the fixtures would have caused. Nor did Dr. Lawrence find the angle of the furrow inconsistent with a suicidal hanging. He thought it likely that Heather had "had a drink or two" because her alcohol level was higher than he had seen from decomposition alone, but it was possible she had not.

Dr. Lawrence considered other possible causes of death, but considering that Heather was a healthy young woman capable of fighting back, he did not think she could have been murdered without leaving any marks. He rejected the idea that she could have been drowned, because he felt that would have entailed "lots of noise, lots of struggling, a lot of injury to her, bruising and so forth, and evidence of struggle in the bathroom." He also thought it unlikely that Heather would have been taking a bath in her underwear. Manual or ligature strangulation would have left marks on the neck. Heather could have been suffocated without leaving marks, but usually suffocation causes cuts and bruises inside the lips. Dr. Lawrence acknowledged that the "carotid sleeper hold" sometimes employed by police can cause unconsciousness quickly and without leaving marks, but said it is very difficult to do correctly, and if the victim is struggling injuries are highly likely.

Dr. Lawrence had difficulty imagining how, if Younger had managed to render Heather unconscious, he could have tied the knots while holding her body up. Dr. Lawrence also thought that a murder would have caused enough disturbance that the children, at least, would have been aware of it. He could not rule out a homicide in this case, but he "would be amazed" if it were not a suicide. If he had been the pathologist in this case, he would have marked the "suicide" box on his report.

### 9. The Psychiatrists' Testimony

The prosecution called Dr. Robert Simon, a psychiatrist from Maryland who did some forensic psychiatry as part of his practice. Dr. Simon was on call two or three times a month to consult with emergency room doctors about patients who were violent or suicidal. He had authored a number of articles and book chapters on suicide risk assessment. Dr. Simon had reviewed police reports from Santa Rosa, Redding, Oroville, and Medford, preliminary hearing documents, the coroner's reports, letters between Heather and Younger while Younger was in jail, district attorney investigator's reports, letters from Heather to Nina Marlow written in December 1995, transcripts of interviews with Younger, letters from Younger to his mother after the investigation began, interviews with Heather's grandmother and uncle, the Oregon youth program reports of Heather's counseling, and her high school records. He concluded Heather had no suicide risk factors.

Dr. Simon noted Heather was devoted to her children, had plans to go to school, was looking forward to Christmas, anticipated receiving an inheritance, was doing well at work, and was looking forward to dating, taking her children to Colorado to see her parents, and being with Nina Marlow when Nina's baby was born. Heather had maintained her relationships with Nina and with coworkers. There was no evidence of psychiatric disorder, suicide attempts, or family history of suicide. (When informed about the suicide of Heather's paternal grandfather, Dr. Simon acknowledged that would be a significant risk factor.) While Heather's letters to Nina indicated that Younger was "driving her crazy," Dr. Simon found it significant that she told Nina "I beat the crap out of him today, you wouldn't believe it, cool, huh, so proud of myself." This showed her anger was directed outward, not inward. Dr. Simon also noted Heather's statement: "I can't wait until he is out and you are visiting. Tell Andy to come with you, ha, I need a piece of ass. We're partying on my birthday." This showed she was looking forward to getting away from Younger. It also showed she was thinking about sex, which suicidal people do not do.

While the counseling reports showed Heather was distressed as a teenager, Dr. Simon noted they also showed that she reached out to get help. The fact that she reported Younger's abuse to the police further demonstrated that she coped with her difficulties by looking to people in a position of authority for help, instead of by withdrawing.

On cross-examination, Dr. Simon acknowledged that suicides do occur among successful people who give no indication of being suicidal, and that most suicides occur on the first attempt. He agreed that hanging is the third

most common method of suicide for women, and that homicidal hanging is rare. He also agreed that in general, people tend not to speak ill of deceased friends or family members, and not to accept that a family member committed suicide.

The defense called Dr. Jerome Motto, a psychiatrist who specialized in suicide. He had published extensively on the topic, and had served as president of the American Association of Suicidology and secretary-general of the International Academy for Suicide Research. A professor emeritus of the University of California, San Francisco Medical School, Dr. Motto continued to do some teaching and regularly consulted with hospitals in San Mateo County regarding patients at high risk of suicide. He had reviewed the police reports, interviews, and all investigative materials provided to him by defense counsel and the district attorney. He did not place much weight on any of Younger's statements in reaching his conclusions.

Dr. Motto found three factors consistent with suicide in this case: Heather's emotional vulnerability, reflected in her history of truancy, running away from home at an early age, and her "pathological" attachment to Younger, which Dr. Motto attributed to a substitution of Younger for her parents at an early age; Heather's tendency to act impulsively under provocation, reflected in various incidents when she assaulted Younger; and the vital role of her children, to whom Dr. Motto believed Heather transferred her need for a stable family life when her relationship with Younger broke down. Dr. Motto noted that in a letter to Younger when he was in jail, Heather said the children were "the only things that can keep me going." If, on December 22, 1995, Heather felt the children were being taken from her, the acute psychic pain of that event could have led to a "panic suicide."

Dr. Motto had also considered factors pointing away from suicide: Heather was a young woman, who was "a fighter," with much to look forward to in her life, and no psychiatric history. He still concluded it was quite possible she had committed suicide. Dr. Motto believed that "a good half of suicides do not have a psychiatric diagnosis." He disagreed with a study finding that 90 to 95 percent of suicides are people with psychiatric diagnoses.

### DISCUSSION

Over the objection of defense counsel, the court gave the jury the pre-1999 version of CALJIC No. 2.50.02, which stated in relevant part: "If you find that the defendant committed a prior offense involving domestic violence, you may, but are not required to, infer that the defendant had a

disposition to commit the same or similar type offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime of which he is accused."[2]

In *People v. James, supra*, 81 Cal.App.4th 1343 (*James*), this court held that former CALJIC No. 2.50.02 violated a defendant's federal constitutional right to due process by permitting a conviction based on proof of prior offenses, rather than proof of each element of the charged offense. (81 Cal.App.4th at pp. 1352-1357.) We decided the error must be tested on appeal by asking whether there is reasonable doubt that the faulty instruction affected the jury's verdict. (*Id.* at pp. 1360-1363.) Younger contends the trial court erred prejudicially by giving his jury former CALJIC No. 2.50.02. Since briefing in this case was completed before our decision in *James*, we asked the parties for supplemental briefs discussing the *James* analysis. We conclude that reversal is required; we believe there is reasonable doubt that the jury avoided resting its verdict on an improper inference of guilt from propensity.[3]

The Attorney General argues that, when the challenged instruction is considered in context with other instructions given by the court, there is no reasonable likelihood the jury would draw the illogical conclusion that Younger's guilt of the charged offense could be based solely on evidence of prior domestic violence. The Attorney General claims the following instructions ensured the jury would properly base its verdict on all the evidence: CALJIC No. 2.90, discussing the presumption of innocence and the standard of proof beyond a reasonable doubt, and telling the jurors to assess whether they had an abiding conviction of the truth of the charge "after the entire comparison and consideration of all the evidence"; CALJIC No. 1.01, requiring the jurors to "consider these instructions as a whole and each in

[2]In 1999, CALJIC No. 2.50.02 was revised to include the caution: "However, if you find [by a preponderance of the evidence] that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove [beyond a reasonable doubt] the [he][she] committed the charged offense[s]. The weight and significance, if any, are for you to decide." (CALJIC No. 2.50.02 (Jan. 2000 new) (6th ed. 1996) pp. 17-18.)

[3]The Attorney General, citing *People v. Breverman* (1998) 19 Cal.4th 142, 174 [77 Cal.Rptr.2d 870, 960 P.2d 1094], argues that any error in former CALJIC No. 2.50.02 amounts to "misdirection of the jury" and is not reversible unless there is a reasonable probability of a result more favorable to the defendant in the absence of the error. However, the *Breverman* court made it clear it was discussing instructional error amounting to "an error of California law alone." (*Breverman, supra*, 19 Cal.4th at p. 165.) The Attorney General does not suggest any purely state law error involved in former CALJIC No. 2.50.02. It cannot be seriously disputed that "jury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution." (*People v. Flood* (1998) 18 Cal.4th 470, 491 [76 Cal.Rptr.2d 180, 957 P.2d 869].) Therefore, the federal standard of review applies, as discussed in *James*. (81 Cal.App.4th at pp. 1360-1363.)

light of all the others," and not to "single out any particular sentence or any individual point or instruction and ignore the others"; CALJIC No. 8.10, defining murder and stating that "each of the following elements must be proved: One, a human being was killed. Two, the killing was unlawful. And three, the killing was done with malice aforethought"; and CALJIC No. 2.01, informing the jury that "a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only, one, consistent with the theory that the defendant is guilty of the crime, but two, cannot be reconciled with any other rational conclusion."

The Attorney General made a similar argument in *James*. We noted that several courts have followed this line of reasoning to conclude there was no error in former CALJIC No. 2.50.01, which permitted guilt in sex offense cases to be determined by the same chain of inference described in former CALJIC No. 2.50.02. (*James, supra,* 81 Cal.App.4th at pp. 1353-1354, citing *People v. Van Winkle* (1999) 75 Cal.App.4th 133, 147-149 [89 Cal.Rptr.2d 28]; *People v. Regalado* (2000) 78 Cal.App.4th 1056, 1062-1063 [93 Cal.Rptr.2d 83]; *People v. O'Neal* (2000) 78 Cal.App.4th 1065, 1078-1079 [93 Cal.Rptr.2d 248]; see also *People v. Waples* (2000) 79 Cal.App.4th 1389, 1397-1398 [95 Cal.Rptr.2d 45].) Two later decisions have likewise decided that other more general instructions cured any error in the former propensity instructions. (*People v. Escobar* (2000) 82 Cal.App.4th 1085, 1101 [98 Cal.Rptr.2d 696] [former CALJIC No. 2.50.02]; *People v. Jeffries* (2000) 83 Cal.App.4th 15, 22-24 [98 Cal.Rptr.2d 903] [former CALJIC No. 2.50.01].)

We maintain our respectful disagreement with the courts adopting this view. We note, first, that there is nothing ambiguous about the instruction at issue.[4] (Compare *Estelle v. McGuire* (1991) 502 U.S. 62, 72, 74-75 [112 S.Ct. 475, 482, 116 L.Ed.2d 385] [finding no "reasonable likelihood" that jury would interpret ambiguous instruction to permit inference of guilt from propensity] and *Calderon v. Coleman* (1998) 525 U.S. 141, 145-146 [119 S.Ct. 500, 503, 142 L.Ed.2d 521] ["reasonable likelihood" test applies to determine whether ambiguous instruction caused constitutional error].) A jury cannot fail to understand that if it determines the defendant has committed other similar offenses, it may infer that he was disposed to commit

[4]The jury did receive related instructions that created ambiguity. CALJIC No. 2.50.1 instructed the jury to determine whether the prior offenses were proven by a preponderance of the evidence. CALJIC No. 2.01, however, which was required in this case because the prosecution's case was entirely based on circumstantial evidence, told the jury that each fact supporting an inference essential to establish guilt must be proven beyond a reasonable doubt. As explained in *James*, we believe the combination of these instructions is likely to confuse a jury. However, the more fundamental error is allowing the improper inference of guilt from propensity. If a jury is properly instructed that propensity evidence is not a sufficient basis for conviction, the only burden of proof problem is one that favors the defendant—a higher than normal standard of proof for prior crimes evidence in cases resting chiefly on circumstantial evidence. (*James, supra,* 81 Cal.App.4th at pp. 1358-1360, and fn. 9.)

*and did commit* the charged offense. The inference of guilt is as faulty as it is unambiguous; neither prior offenses nor propensity prove guilt of a charged offense.

As noted in *James*, we find the instruction inadequate on more general grounds, but at a minimum it is clear that it lacks an essential element—a caution to the jury not to consider the prior offense evidence sufficient for a finding of guilt. (*James, supra*, 81 Cal.App.4th at pp. 1357-1358, fn. 8.) Courts have traditionally guarded against this abuse of prior offense evidence, which has a well-recognized tendency to "overpersuade" the jury. (*People v. Falsetta* (1999) 21 Cal.4th 903, 913-920 [89 Cal.Rptr.2d 847, 986 P.2d 182]; *James, supra*, 81 Cal.App.4th at pp. 1353-1354; *People v. Orellano* (2000) 79 Cal.App.4th 179, 185-186 [93 Cal.Rptr.2d 866].) Of course, the absence of an essential element in one instruction may be remedied by its presence in another, or by considering the instructions as a whole. (*People v. Bolin* (1998) 18 Cal.4th 297, 328 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Jeffries, supra*, 83 Cal.App.4th at p. 22.) But we find the missing element nowhere in the instructions to which the Attorney General has referred us. Those instructions tell the jury to consider all the evidence, and all the instructions. They set out the standard of proof beyond a reasonable doubt, enumerate the elements of the charged crime, and caution the jury that circumstantial evidence must be irreconcilable with a rational conclusion of innocence. However, none of them restrains the jury from accepting the court's invitation to conclude that because the defendant did it before, he did it again.

Considering the instructions as a whole, the jury would be led to believe that the court deemed prior offense evidence sufficient to support an inference that the elements of the charged offense have been established beyond a reasonable doubt. While the jury is told it is not required to draw the inference, it is also granted express permission to do so. The jury would not expect the court to permit an unwarranted or irrational inference. Former CALJIC No. 2.50.02 unduly enhanced the inherently persuasive power of propensity evidence. In a close case, the instruction poses a significant danger that the jury will decide it would be irrational to find a defendant who committed prior offenses not guilty, regardless of the weakness of the direct evidence or of the other circumstantial evidence presented by the prosecution.

We agree with the observation that no reasonable jury will convict a defendant exclusively on the basis of the propensity demonstrated by prior offenses, without giving any consideration to the. evidence of the charged offenses. (*People v. Regalado, supra*, 78 Cal.App.4th at pp. 1062-1063; accord, *People v. Escobar, supra*, 82 Cal.App.4th at p. 1099; *People v.*

*O'Neal, supra,* 78 Cal.App.4th at p. 1078; accord, *People v. Jeffries, supra,* 83 Cal.App.4th at p. 24.) The presumption that juries follow the instructions requiring them to consider all the evidence is a factor tending to support a conclusion that the error in the former propensity instruction is harmless under the circumstances of a particular case, as it was in *James.* (81 Cal.App.4th at pp. 1362-1365.)

However, such an extreme application of the instruction's literal terms is not the only way for the erroneous inference to infect a verdict. If the prosecution's case is weak, or if the strength of the evidence advanced by the defense closely balances the prosecution's evidence, the instruction permits the jury to take an impermissibly easy way out of its deliberations by deciding that, after considering all the evidence, it may resolve its doubts simply by relying on the propensity evidence. While a jury could properly weigh the propensity evidence *together with* the other evidence to reach an ultimate determination whether the elements of the charged offense have been proven, it could also reasonably interpret the instruction to allow a direct leap from the defendant's disposition, over the troubling aspects of the rest of the evidence, to a guilty verdict. Such an improper deliberative process is more than a remote possibility, particularly if there is disagreement among jurors on the strength of the other evidence. If a reviewing court cannot be confident that the deliberations took the proper course, the error cannot be deemed harmless. (*James, supra,* 81 Cal.App.4th at p. 1362.)

This is such a case. The testimony about Younger's behavior around the time of Heather's death was quite damning, but the physical evidence supporting a finding of suicide rather than homicide was equally exculpatory. Nothing in Younger's past acts of domestic violence, all of which involved episodes of sudden rage and crude physical assault, suggested he possessed the sophistication required to plan and execute Heather's murder so as to leave no sign of a struggle or other incriminating evidence, but only a scene that all experts agreed was fully consistent with suicide. It appears Younger was either a very lucky murderer who managed to subdue and hang his victim without causing any bruising or other marks, or a very unlucky abusive boyfriend who abandoned a suicidal partner in suspicious circumstances, as part of an ill-fated attempt to gain sole custody of their children. Former CALJIC No. 2.50.02 allowed the jurors to avoid resolving the conflicts in the evidence, and decide that Younger was a murderer simply because he had battered and threatened to kill domestic partners, including Heather, in the past. To convict him on that basis would have been a denial of due process. (*James, supra,* 81 Cal.App.4th at pp. 1354-1357.)

There was certainly other evidence in the record supporting a finding of guilt. However, we cannot assume the jury rested its verdict on that evidence. We must ask whether the evidence was so overwhelming, or otherwise so inconsistent with the possibility that the jury based its decision

merely on Younger's propensity, as to leave it beyond a reasonable doubt that the same verdict would have been reached in the absence of the faulty instruction. (*James*, *supra*, 81 Cal.App.4th at pp. 1362-1363; *Yates v. Evatt*, *supra*, 500 U.S. 391, 404-405 [111 S.Ct. 1884, 1893].) Our conclusion that there is such reasonable doubt is reinforced by the prosecutor's use of the instruction in her closing arguments. (See *James*, *supra*, 81 Cal.App.4th at pp. 1364-1365, fn. 10 [closing argument cannot cure error in instruction but may exacerbate it].)

The prosecutor characterized the testimony on Younger's domestic violence as a category of evidence that would tell the jury "why he murdered Heather Moore, how he murdered Heather Moore, that in fact it was murder." She reiterated the terms of the instruction permitting the jury to infer from Younger's abuse of Sutton, Taylor, and Heather that he was likely to commit and did commit murder, which the prosecutor described as "the ultimate act of domestic violence." She suggested that "even though we don't know exactly how Mr. Younger accomplished murdering Heather Moore," the nature of his prior assaults indicated he could have smothered Heather on the bed, or surprised her from behind and strangled her. The prosecutor discussed the domestic violence evidence at length, especially the prior assaults against Heather. She reminded the jury again that "you can infer from these assaults, just as the instruction says, you can infer that Mr. Younger had a disposition to commit violence, domestic violence. And you can then infer that he was likely and did commit the crime [with] which he's charged; that is, murder." The prosecutor also told the jury that she did not have to answer the question of how Younger actually killed Heather, "[b]ut certainly his past behavior and his past assaults tell you that he certainly knew how to do this, and was very capable of violence."

These were not improper arguments. Prosecutors have wide latitude to argue reasonable inferences from the evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].) Even inferences based on faulty reasoning from facts in the record are within the bounds of closing argument, for the jury is the ultimate arbiter of the facts. (*People v. Willard* (1907) 150 Cal. 543, 552 [89 P. 124]; accord, *People v. Farmer* (1989) 47 Cal.3d 888, 923 [254 Cal.Rptr. 508, 765 P.2d 940], disapproved on another ground by *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [94 Cal.Rptr.2d 396, 996 P.2d 46].) The jury in this case was given the usual advisements that statements by counsel are not evidence, and that it had the duty to determine which facts were proven by the evidence.

However, a faulty inference presented in the court's instructions to the jury is far different from an unsound inference argued by counsel. This jury

also received the usual advisement that "[y]ou must accept and follow the law as I state it to you regardless of whether you agree with the law." The jury was invited *as a matter of law* to find Younger guilty based on his past offenses. The prosecutor cannot be blamed for taking advantage of the instruction, but her arguments did tend to encourage the jury to substitute proof of the prior offenses for crucial missing elements in the proof specific to the charged offense. The method of killing is not an element of murder, but when the physical evidence supports a finding of suicide as strongly it did in this case, method is obviously a significant consideration in resolving the ultimate question of whether there was an unlawful killing. If the jury concluded it need not decide how Younger murdered Heather, because the ultimate question was resolved by the prior offense evidence, Younger was improperly convicted.

Dr. Lawrence, an experienced pathologist with extensive experience examining victims of homicide and suicide, testified that "[i]t was easy to determine how she hanged herself. It was difficult or impossible for me to figure out a scenario where someone else killed her and hanged her against her will." Taking into account the tendency of propensity evidence to prejudice the jury against the defendant, we are left with a reasonable doubt whether the jury decided that Younger's past offenses, instead of the evidence of the charged offense, proved he had murdered Heather. (*James, supra*, 81 Cal.App.4th at p. 1362.)

Younger's conviction of car theft was not affected by the error in former CALJIC No. 2.50.02, and he has not challenged its validity on appeal. Therefore, that conviction stands.

## DISPOSITION

The murder conviction is reversed; the car theft conviction is affirmed.

McGuiness, P. J., and Walker, J., concurred.