Filed 4/12/13  P. v. Joachim CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,**<br><br>       **Plaintiff and Respondent,**<br><br>**v.**<br><br>**DUANE SCOTT JOACHIM,**<br><br>       **Defendant and Appellant.** | **A135323**<br><br>**(Napa County<br>Super. Ct. No. CR157106, CR159624)** |

Duane Joachim (Joachim) appeals from a judgment of conviction and sentence after a jury found him guilty on two counts of receiving stolen property.  (Pen. Code, § 496, subd. (a).)[1]  He contends:  the trial court erred in admitting his prior conviction for receiving stolen property under Evidence Code section 1101, subdivision (b); and (2) the prosecutor committed misconduct when he asserted in closing argument that the van Joachim was driving was "littered with" or full of stolen property, and by suggesting that Joachim was the one who not only possessed the stolen property, but stole it.  We will affirm the judgment.

I.  FACTS AND PROCEDURAL HISTORY

An information filed in July 2011 in superior court case number CR157106 charged Joachim with first degree residential burglary (§ 459) and receiving stolen property (§ 496, subd. (a)).  The information further alleged that he served a prior prison term.  (§ 667.5, subd. (b).)  The burglary count was dismissed in October 2011.

---

[1]      Unless otherwise indicated, all statutory references are to the Penal Code.

An information filed in December 2011 in superior court case number CR159624 charged Joachim with receiving stolen property (§ 496, subd. (a)). It also alleged that he served a prior prison term (§ 667.5, subd. (b)).

The two cases were consolidated for trial.

A. *Trial*

The prosecution produced evidence regarding the 2010 and 2011 charged offenses of receiving stolen property, as well as evidence – over Joachim's objection – of his 2006 offense of receiving stolen property.

1. *2010 Offense: Stolen Items in a Truck*

On July 16, 2010, at approximately 2:30 p.m., Napa County Sheriff's Deputy Aaron Mosley responded to a call of a "suspicious subject" on Highway 121 at Cuttings Wharf Road in Napa County. Upon arrival, Deputy Mosley observed a 1997 Dodge Dakota truck parked in a dirt pullout. Joachim was standing next to the truck's passenger side window. In the passenger seat was Anthony Reynolds (Reynolds).

Deputy Mosley parked his vehicle behind the truck, and Joachim approached and identified himself. Mosley conducted a search of Joachim's person and the truck. In the bed of the truck, Mosley found "some power tool items," including two chainsaws, two laser levels, a concrete nail gun, and an electric saw. Also in the truck were a wooden toy sailboat, a jewelry box, and an antique tea set.

Joachim told Deputy Mosley that the truck belonged to Jose Rochen (Rochen), who had left to get help because there was a problem with the truck's transmission. Joachim explained that they had taken the truck to go fishing the prior evening at 11:00 or 11:30 p.m., slept in the vehicle after fishing, and then realized the truck had transmission problems.

Deputy Mosley did not see any fishing equipment in the truck, however, and Joachim appeared "nervous" and "fidgety." Although the Department of Motor Vehicles confirmed the truck was registered to Rochen, Rochen never returned to help move the

vehicle.  Instead, it was Joachim's brother who later appeared with a trailer to tow the truck; Deputy Mosley, however, refused to release the vehicle.[2]

Deputy Mosley later determined that several items in the truck had been stolen in three burglaries that had taken place on or about that same day.  The lasers, concrete nailing gun, and electric saw had been taken from the side yard of the home of Martin Bida in Sonoma earlier on July 16, 2010.  The chainsaws had been taken during a burglary from the home of Rudy Doormann on Milton Road on July 16 as well.  And the toy sailboat, jewelry box, and antique tea set had been stolen from the home of Billy Hester on Milton Road sometime before July 18, 2010.

Both Joachim and Reynolds were charged in connection with this incident; while Joachim went to trial, Reynolds pleaded no contest to a charge of possession of stolen property.

## 2. *2011 Offense:  Stolen Items in a Van*

### a. *Burglary of Lewis's home on Milton Road on May 3*

On May 3, 2011, Roger Lewis received a phone call that someone had broken into his house on Milton Road.  Upon returning home, Lewis found that his garage window was broken and a number of items had been taken from his residence, including a digital camera, a brass "Indian bowl," a box containing jewelry and an antique watch from his father, and a vase given to him as a memento of his mother.

### b. *Lagorio's observations of a man and van on Milton Road on May 3*

Also on May 3, 2011, at 9:00 or 9:30 a.m., Frank Lagorio observed a Ford van that he did not recognize and two men, one of whom was coming out of the backyard of Lagorio's house on Milton Road, about 700 or 800 feet away.  Lagorio drove to his house, but the men and the van had left by the time he got there.  Lagorio later saw the

---

[2]     As discussed *post*, law enforcement subsequently discovered a letter dated October 15, 2010, in which Joachim indicated that he had not requested money from an individual until *his* Dodge pickup was taken by the Napa County Sheriff's Department. At trial, the prosecutor argued that this was an admission by Joachim that he owned the truck.

Ford van – described as red and a "fairly late model" – driven up and down Milton Road two or three times. Lagorio thought this to be strange, because he knew there had been burglaries in the area. He wrote down the van's license plate number, which his son gave to officers about two days later.

Lagorio told law enforcement that the men appeared to be in their 30's, of medium build, and approximately 5'8" to 5'9". At trial, Lagorio said he did not think Joachim (whom Lagorio agreed looked in his mid-50's and about 6'3") was the man he saw by the van, but he also noted that he "wasn't paying attention." Lagorio passed within five feet of one man, but was 600 or 700 feet away from the other and "did not get close to him."

*c. Willis' observations of the red van on Milton Road on May 3*

About 10:00 a.m. on May 3, 2011, Jeffrey Willis saw two men using spray paint to touch up a red Ford van in the parking lot of his workplace at the marina on Milton Road. Willis asked the men why they were there; one of the men replied it was "nice and sunny." Willis wrote down the van's license plate number and gave it to law enforcement.

When later shown a photographic lineup and asked to identify the man with whom he spoke, Willis picked someone other than Joachim. However, Willis told officers he might be able to recognize the person if he saw him again. At trial, Willis testified that Joachim "appear[ed] to be the man [he] saw."

*d. Joachim's connection to the red van*

At 1:00 a.m. on May 5, 2011, Napa County Deputies Hallman and Ackman conducted surveillance of Joachim's home in Martinez. Deputy Hallman saw Joachim and another person get in and out of a red van four times before they left in the van, with Joachim in the passenger seat. Deputy Ackman had seen Joachim "near and around the driver's side." Deputy Hallman was unable to determine where the van went or who was driving it: the van belonged to Carl Montano, but Deputy Hallman knew Montano and believed that the driver was not Montano.

On May 11, 2011, Joachim arrived at Affordable Self Storage in Pacheco and spoke with manager Leslie Stevens. Stevens noted that Joachim was driving a red van.

4

Joachim's storage space was a large "10 by 24" unit that he used to store a variety of household goods. Joachim told Stevens that he sold items at flea markets or yards, or "wherever he could sell [them] at." The storage unit was registered to a "Mr. Crites" and was previously registered to Reynolds; Joachim and the two other men exchanged registration of the unit "because of other things that were going on in their lives." However, they each had access to the unit and used it, regardless of whose name was on the registration.

On May 12, 2011, Deputy Hallman asked Contra Costa County Detective Murphy to look for the red Ford van that was associated with Joachim and linked to burglaries in the Napa area. After failing to find the van at Joachim's home, Detective Murphy went to Joachim's storage unit and conducted a probation search. He did not find anything of note during his investigation.

At about 4:40 p.m., Detective Murphy spotted Joachim driving the red Ford van at Blum Road and Pacheco Boulevard. He noted the van's license plate number, which matched the number observed by Willis. Detective Murphy conducted a traffic stop based on an outstanding warrant for Joachim's arrest, arrested Joachim, and impounded the van. The van did not have windows on the sides, and its back windows had been blacked out, making it impossible to see what was in the back of the van. But Detective Murphy looked inside and saw that it was "full of property." Reynolds was in the passenger seat.

The van was towed to a secure facility, and Joachim was taken to jail and booked pursuant to the warrant. Joachim had $6,647 in his wallet.

### e. Search of the red van

Detective Murphy turned the van over to Deputy Hallman the following day. Hallman confirmed that the van was the one he saw Joachim enter during Hallman's surveillance on May 5, 2011. The van was "packed," and it took a few hours to inventory its contents.

Inside the pocket on the driver's door were a pair of rubber gloves that were "[p]ossibly used in burglaries" to avoid leaving fingerprints. A "window punch" – a

5

device that can be used to break windows – was in a "pretty obvious place" that could be reached by someone in the driver's seat.

The center console contained documents pertaining to Joachim: an invoice for tires, dated four or five days before the search, bearing Joachim's name and address; a letter dated October 15, 2010, signed by Joachim and addressed to "Carl," in which Joachim stated that he had not asked for money until *his* Dodge pickup (allegedly associated with the July 2010 stolen property) was taken by the Napa County Sheriff's Department; and a statement from Aladdin Bail Bonds, indicating that Joachim had violated the law by driving with a revoked driver's license and without proper registration (at trial, the court explained to the jury that this evidence was admitted solely to connect Joachim's name with the van).

In the rear of the van, Deputy Hallman found a vast amount of property, at least some of which had been stolen. Hallman was unsure of the exact number of stolen items, but the van contained at least the following: property taken from Lewis' residence on May 3, 2011, namely the brass bowl from India, a small egg-shaped ornate vase, a digital camera, and four coins; a cell phone and a statue of an old man petting a dog, which were determined to be stolen and were returned to their rightful owner; and a point-of-sale machine that could be used for credit card transactions, which had been taken during a burglary in Marin, in which the victim also lost $3,000 to $3,500 in cash; and four coins that had been stolen from the Lew home. There were also totes, boxes, and display cases likes the ones used at flea markets, as well as a lawn mower and "all kinds of tools." A container held watches, necklaces, costume jewelry, Korean currency, and a pocket knife. Deputy Hallman also found a "small coin size Ziploc plastic baggy with [a] white crystal substance," a Dell laptop computer, a gold test kit, two pairs of binoculars, a "scanner type radio," a digital scale, and a CD radio.

### 3. *2006 Prior Conviction: Stolen Items in Joachim's Car*

About 6:25 p.m. on September 3, 2006, Deputy Ackman stopped Joachim's car in American Canyon (Napa County). Joachim gave the deputy a false name. While searching Joachim's vehicle, Ackman found property that was reported missing after a

vehicle burglary at a landscaping business. There were two irrigation remote controls and a pair of "vice grips" in Joachim's trunk, and a Skil saw and air compressor hose on Joachim's rear passenger floorboard. Ackman also found bolt cutters, a hacksaw, $1,600 in cash, and other items.

Joachim told Deputy Ackman that he had purchased the items at a flea market, but he offered no receipts or explanation for the purchase. The court informed the jury that it was taking judicial notice that Joachim had been found guilty of receiving stolen property in connection with that incident.

B. *Jury Verdict and Sentence*

In March 2012, the jury found Joachim guilty on both counts – receiving stolen property in 2010 (case number CR157106) and receiving stolen property in 2011 (case number CR159624). Joachim waived his right to a jury trial on the prior prison term allegation, and the court found the allegation true.

In April 2012, the court denied probation and imposed sentence as follows: in case number CR157106, a midterm sentence of two years; in CR159624, the upper term of three years with a consecutive one-year term for the prior prison enhancement under section 667.5, subdivision (b). The court ordered the terms served in county jail pursuant to section 1170, subdivision (h)(5).

Joachim filed a notice of appeal in both cases.

II. DISCUSSION

As mentioned, Joachim contends: the trial court erred in admitting his prior conviction for receiving stolen property under Evidence Code section 1101, subdivision (b); and the prosecution committed misconduct when it asserted in closing argument that the van was full of stolen property and suggested that Joachim was the one who stole it. We address each contention in turn.

A. *Admission of Prior Conviction*

The prosecutor argued that the evidence relating to Joachim's 2006 conviction for receiving stolen property was admissible as evidence of a common scheme or plan under

Evidence Code section 1101, subdivision (b). Over Joachim's objection, the trial court agreed. Joachim contends this was error.

As a general matter, evidence of a defendant's character or character trait, including of past acts such as an uncharged criminal offense or prior conviction, is inadmissible when offered to prove the defendant's conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) Such evidence is not made inadmissible by this provision, however, if it is offered to show an act by the defendant (such as motive, intent, preparation, plan, or identity) other than the defendant's disposition to commit the crime. (Evid. Code, § 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) The probative value of the uncharged offense evidence must be substantial, and it must not be largely outweighed by the probability that its admission would create a serious danger of prejudice, confusion of the issues, or misleading of the jury under Evidence Code section 352. (*Ewoldt*, at p. 393; *People v. Kipp* (1998) 18 Cal.4th 349, 371.) We review the court's admission of the evidence for an abuse of discretion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

### 1. *Common Design or Plan Under Evidence Code Section 1101*

Evidence of a prior criminal offense is admissible to "support[] the inference that defendant committed the charged offenses pursuant to the same design or plan defendant used to commit the uncharged misconduct." (*Ewoldt, supra*, 7 Cal.4th at p. 393.) For the evidence to be admissible on this basis, there must be " 'a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*Id*. at p. 402.) These common features must indicate the existence of a shared plan, although the plan *does not have to be distinctive or unusual*. (*Id*. at p. 403.) All that is necessary is the existence of striking similarities in the manner in which the charged and uncharged crimes were carried out. (*People v. Scheer* (1998) 68 Cal.App.4th 1009, 1020.)

Here, there was sufficient evidence to suggest a common plan between the 2006 offense and the charged offenses: Joachim drove around in a vehicle with stolen tools

8

and other property, while claiming that the property was associated with transactions at a flea market or yard sale.

In both the 2006 offense and the charged 2010 and 2011 offenses, Joachim possessed stolen power tools and other equipment. In 2006, Joachim was convicted for receiving a stolen compression hose, hacksaw, and remote controlled sprinkler system used for irrigation. In 2010, officers seized a variety of similar items from Joachim's vehicle, including "construction type" lasers, two chainsaws, an electric saw, and a concrete nail gun. In 2011, officers searching Joachim's van found, among other things, "all kinds of tools."

In both the 2006 offense and the charged 2011 offense, Joachim claimed the stolen property was lawfully obtained and related to the flea market. In 2006, he told officers that he bought the stolen items in his vehicle from the flea market – without producing any receipts or explanation for buying them. In 2011, he told Stevens that he sold property at flea markets and yard sales. One reasonable inference is that he sold items – including stolen items he received – at the flea market.

In both the 2006 offense and the charged 2010 and 2011 offenses, Joachim used a motor vehicle to transport stolen goods in Napa County. In 2006, Deputy Ackman searched Joachim's car in American Canyon and found stolen property in his trunk and on the back floorboard of his car. In 2010, officers discovered stolen "power tool items" in the back of his truck along Cuttings Wharf Road, along with several items taken from homes on Milton Road. In a 2011 search of the van, officers found stolen property taken from Lewis' home on Milton Road. The court did not abuse its discretion in concluding that the evidence of Joachim's prior offense of receiving stolen property was of sufficient probative value for admission pursuant to Evidence Code section 1101, subdivision (b).

## 2. *Evidence Code Section 352*

Joachim argues it was highly prejudicial to admit the evidence of his prior act of receiving stolen property, because the evidence on the salient issue in this case – whether he knew the items in the truck (in 2010) and the van (in 2011) were stolen – was not strong: he was not the registered owner of the vehicles; Reynolds had entered a plea to

9

receiving stolen property in the 2010 case; a large number of items in Joachim's storage unit and in the van in 2011 had not been determined to be stolen; and Joachim's fingerprints were not found on the stolen property.

The trial court did not abuse its discretion in deciding that the evidence was not precluded by Evidence Code section 352. First, contrary to Joachim's suggestion, there *was* substantial evidence indicating that he knew the property in the truck and in the van was stolen. Joachim admitted that he had been in the truck and even admitted in his October 2010 letter that it was *his* truck. Multiple items of documentary evidence in the van linked it to Joachim, and he was seen going in and out of the van and even driving it. Under these circumstances, the fact that he was not the actual registered owner of the vehicles meant little. Although Reynolds had entered a plea to receiving stolen property in the 2010 case, that did not mean that Joachim – who was also present – had not received the stolen property too. And while fingerprints were not found on the stolen property, police did find rubber gloves inside the pocket on the driver's door of the van – right after Joachim had been driving it – which could have been used to avoid leaving fingerprints.

Second, the evidence of the prior offense was not unduly prejudicial. The prior offense evidence was not likely to inflame the passions of the jury, and it was no more egregious than either of the charged crimes. Moreover, the jurors were told by the court that Joachim had been found guilty on the 2006 charge; evidence of a prior offense is less prejudicial where the uncharged act led to a criminal conviction because it is less likely the jury might want to punish the defendant for the prior act. (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.)

Joachim contends "there was little doubt that the jury would consider the prior not for common scheme or plan, but as improper propensity evidence." We disagree. The court instructed the jury pursuant to CALCRIM No. 375, as follows: "If you decide the defendant committed the [prior] offense and act [by a preponderance of the evidence], you may, but are not required to consider the evidence *for the limited purpose of deciding whether or not defendant had a plan or scheme to commit the offenses alleged in this*

10

*case*.  In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the [act], and the charged offenses.  *Do not consider this evidence for any other purpose*.  If you conclude the defendant committed the act, that conclusion is only one factor to consider along with all the other evidence.  *It is not sufficient by itself to prove the defendant guilty of receiving stolen property*.  The People must prove each charge beyond a reasonable doubt."  (Italics added.)  We presume jurors understand and follow the court's instructions where, as here, there is no evidence to the contrary.  (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Joachim has failed to establish that the court abused its discretion in admitting the evidence of Joachim's 2006 offense for the limited purpose of showing a common plan or design under Evidence Code section 1101, subdivision (b).

B.  *Prosecutorial Misconduct*

Joachim contends the prosecutor committed misconduct by suggesting (1) the van was full of stolen property, rather than containing just eight to ten identified stolen items, and (2) Joachim committed the underlying burglaries.  Neither constitutes misconduct based on the record in this case.

1.  *Legal Standard*

The standard for review of alleged prosecutorial misconduct is well-established.  ""'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."  [Citation.]  When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'"  [Citations.]"  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305; see *People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

11

Prosecutors may not state facts that are not in evidence or mischaracterize the evidence, but they have "wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Dennis* (1998) 17 Cal.4th 468, 522; *People v. Valdez* (2004) 32 Cal.4th 73, 133.)  "Even inferences based on faulty reasoning from the facts in the record are within the bounds of closing argument, for the jury is the ultimate arbiter of the facts." (*People v. Younger* (2000) 84 Cal.App.4th 1360, 1384 (*Younger*).)

### 2. *Prosecutor's Characterization of the Van Contents*

During closing argument, the prosecutor stated:  "Now, if the defense tries to say that there's only eight items that are stolen in this van, don't be misled.  This van is *littered with stolen items*." (Italics added.)  The defense objected, contending "there's absolutely no evidence that any other item in the van was stolen.  There's no evidence."  The prosecutor replied:  "*It's argument*, your Honor." (Italics added.)  The court then told the prosecutor:  "Well, stick to the facts.  I'll let you finish your argument."

The prosecutor continued along the same lines:  "This van is littered with evidence, costume jewelry, gold rings, the defendant is selling all of these items at flea markets.  It's just *riddled with stolen property*.  These deputies are conducting a Napa County investigation.  They're taking fingerprints for Napa County purposes.  They are only investigating Napa [County] crimes.  So as a jury we're only looking at Napa County cases and what's happening here.  So I ask you not to speculate as to what's going on elsewhere.  And then even more property within the van.  [¶] Now what legal purpose would someone possess all of these random items when so much of this is stolen property, *there's so much evidence that so much of this is stolen property*?" (Italics added.)

The defense again objected:  "[Defense Counsel]:  Your Honor, again I object.  There was evidence that eight out of hundreds of items – [¶] [Court]:  You'll get a chance.  [¶] But it is a misstatement of the facts and it's asking the jury to speculate that the other items were stolen.  It's improper.  [¶] [Court]:  All right.  [¶] [Prosecutor]:  I'm asking what legal purpose is there – [Defense Counsel]:  And that's asking to speculate.  [¶] [Court]:  No.  I think he can do it based on the circumstance.  I'll allow the argument."

12

The prosecutor continued with the assertion that the van was full of stolen property (this time adding the suggestion that Joachim was the one who stole it – a theme we address *post*): "There's no coincidence that the defendant happens to be at the same locations as the burglaries, as they happen, and then found to be in a van *full of this stolen property*. . . . [¶] We have photographs of this van, you can just see – you can't really see it, but in the pictures you can see it's littered with property in the front seat. There's the window punch and a watch and it looks like a hand held radio of some sort. Just a various box of items, *I suggest they're stolen*. [¶] Here's the defendant with watches, cell phones, a knife, random jewelry. [¶] Now, you can see from the picture from the back of this van that it's literally piled to the roof with stuff. The defendant says he sells this stuff at the flea market, and I suggest to you the evidence shows strongly that he gets it from people's houses that he doesn't have permission to get the items from. Milton Road seems to be a pretty common place." (Italics added.)

Joachim now argues that "[t]he prosecution in this case committed misconduct by asserting, under the guise of argument, facts not in evidence," and that the evidence was actually that, despite taking hours to inventory the contents of the van, the police identified only eight stolen items.

The prosecutor did not commit misconduct. In context, stating that the van was "full of" or "littered with" stolen property was just an attempt by the prosecutor to get the jury to draw a certain inference from the evidence. It was, in effect, the prosecutor's characterization of the number of stolen items in the van. If the jury concluded from the evidence – as the defense repeatedly urged it to do – that there were only eight stolen items in the van, the jury was free to reject the prosecutor's characterization as an exaggeration. Alternatively, the jury could conclude that eight stolen items was indeed enough for the van to be "littered with" stolen property, or it could infer from the presence of those eight stolen items – and all the rest of the evidence – that some or all of the other property was stolen too. But this is not a situation where, in the absence of any evidence admitted at trial as to whether any of the property was stolen, the prosecutor ventured *outside the record and stated as a fact* that the property was stolen; the

prosecutor here merely "suggest[ed]" and "argu[ed]" that the property was stolen, asking the jury to draw such an inference from the evidence that *was* admitted at the trial.

Furthermore, the defense had ample opportunity to discredit the prosecution's theory that the van was full of stolen property and to argue a contrary inference. Indeed, defense counsel got his point across to the jury during the *prosecutor's* closing argument by making speaking objections after the prosecutor's statements. Defense counsel then in his own closing argument further told the jury there were no witnesses who could testify that the items were stolen and no evidence that the goods were wrongfully taken. In short, the jurors were presented with two competing inferences that the attorneys were asking them to draw from the evidence as the jury found it. Joachim fails to establish prosecutorial misconduct.

3. *Prosecutor's Suggestion That Joachim Stole the Property*

Several times during his closing argument, the prosecutor suggested that Joachim did not just possess stolen property, but knew the property was stolen because he was the one who had committed the underlying burglaries. At various points the prosecutor argued: "And No. 2, when he concealed or withheld the property, he knew it was stolen. Well, *he had just stolen it*. The evidence is clear." "And the defendant, his truck's broken down on the side of the road as he's heading back out to Martinez *where he came from to steal these items*." "And in the second case with the van, he knows these items are stolen because he just, *it appears that he just burglarized Mr. Lewis's property*, and the back of this van is piled high to the ceiling with stolen items, stolen items all over the car." "Martin Bida over in Sonoma. On July 16th, the day that these pieces of property were found, he lives over in Sonoma. Two PLS lasers, Simpson nail gun were stolen. He doesn't know defendant. *The defendant didn't have permission to be on his property or in his yard*." "Rudy Doorman lives at [] Milton Road. Same, right on *that street that the defendant knows that he hits*…" "Now, not all of it was recovered. He had some time to get rid of them, turn it into some cash, which is what he does. *He steals items*, possesses them, sells them at flea markets." "The defendant says he sells this stuff at the flea market, and *I suggest to you the evidence shows strongly that he gets it from people's*

14

*houses that he doesn't have permission to get the items from.*  Milton Road seems to be a pretty common place."  "The defendant concealed or withheld the property, because he's not getting it back, he's going to sell it.  He knew that the property had been stolen.  Well, *I suggest that he actually stole the property*."  "Well, in the Dodge Dakota it's right in the back, it's an open pickup.  It's hard to miss.  He's lying about its presence, he's concealing his knowledge of it.  But *he knows it's there because he had just taken it*.  It happened the same day.  *This guy is like a magnet with stolen property*."

The defense objected to the "magnet comment" on the ground that the prosecutor was arguing that Joachim had a propensity to commit the crime; defense counsel also moved for a mistrial, which the court denied.  The prosecutor then explained that he did not have to prove that Joachim committed the burglaries, but that Joachim possessed stolen property, and that "[t]here is a mountain of evidence that makes it unreasonable that he didn't."[3]

Joachim contends the prosecutor's indication that Joachim stole the property was improper, because there was no evidence that he had done so.  In fact, Joachim argues, Lagorio did not identify Joachim as one of the men he saw leaving his property, and actually described the men as being of different age and physique than Joachim.

Joachim's argument is unpersuasive.  In the first place, contrary to his urging, there *was* evidence from which it could be inferred that Joachim was one of the participants in the burglaries.  Ample evidence linked Joachim to the red Ford van, which was seen trolling Milton Road on the day burglars gained access to Lewis' home by breaking a window; Willis testified at trial that Joachim was on Milton Road touching up this van on the very morning of this burglary; when Detective Murphy stopped the van a

---

[3]     Joachim also notes that the prosecution began its closing argument by telling the jury:  "The defendant, [Joachim], is a magnet for stolen property.  Everywhere he goes there seems to be a burglary going on, and everywhere he leaves, he seems to be in possession of stolen property."   The defense did not object.  At any rate, this preliminary thematic statement is merely an argument based on the evidence; the jury was free to decide whether the prosecutor's characterization was supported by the evidence or not, and there was nothing deceptive or improper about it.

few days later, Joachim was driving, and within his reach was a pair of rubber gloves that could be used to avoid leaving fingerprints and a window punch that could be used to break windows; and the van contained a number of stolen items from multiple burglaries – including the burglary of Lewis' house – just as there had been a number of stolen items in the Dodge truck that Joachim would later claim to be his.

Moreover, whether the prosecutor's inference was compelling or not, it was not misconduct for the prosecutor to ask the jury to draw it. (See *Younger, supra*, 84 Cal.App.4th at p. 1384.) At no time did the prosecutor state that he had specific, direct evidence that Joachim stole the items in the van. To the contrary, he repeatedly said that he was merely suggesting that Joachim was the burglar based on other evidence admitted at the trial. Furthermore, the court instructed the jury pursuant to CALCRIM No. 222, telling the jurors: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discussed the case, but their remarks are not evidence."

In the totality of the circumstances, there is no reasonable likelihood that the jury construed or applied any of the prosecutor's statements in an objectionable manner, or that the jury used the prosecutor's statements to convict Joachim of crimes it did not otherwise believe he committed. Joachim fails to establish prosecutorial misconduct.

III. DISPOSITION

The judgment is affirmed.

16

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

BRUINIERS, J.